ORAL ARGUMENT NOT YET SCHEDULED

Nos. 23-7080, 23-7082

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ESTATE OF JEREMY ISADORE LEVIN, *et al.*,

*Plaintiffs-Appellees*,

JAMES OWENS, *et al.*,

*Plaintiffs-Appellants*,

v.

WELLS FARGO BANK, N.A.,

*Defendant-Appellee*,

UNITED STATES OF AMERICA,

*Intervenor-Appellee*.

On Appeal From The United States District Court
For The District Of Columbia
Nos. 21-cv-126, 21-cv-127, 21-cv-128, 21-cv-420
(James E. Boasberg, C.J.)

## OPENING BRIEF FOR OWENS APPELLANTS

Matthew D. McGill
Jessica L. Wagner
Samuel C. Speers
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone: 202.955.8500
mmcgill@gibsondunn.com

*Counsel for Owens Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the Owens Appellants certify as follows:

## I.    Parties

James Owens, Victoria J. Spiers, Gary Robert Owens, Barbara Goff, Frank B. Pressley, Jr., Yasemin B. Pressley, David A. Pressley, Thomas C. Pressley, Michael E. Pressley, Berk F. Pressley, Jon B. Pressley, Marc. Y. Pressley, Sundus Buyuk, Montine Bowen, Frank Pressley, Sr., Bahar Buyuk, Serpil Buyk, Tulay Buyuk, Ahmet Buyuk, Dorothy Willard, Ellen Marie Bomer, Donald Bomer, Michael James Cormier, Andrew John William Cormier, Alexandra Rain Cormier, Patricia Feore, Clyde M. Hirn, Alice M. Hirn, Patricia K. Fast, Inez P. Hirn, Joyce Reed, Worley Lee Reid, Cheryl L. Blood, Bret W. Reed, Ruth Ann Whiteside, Lorie Gulick, Pam Williams, Flossie Varney, Lydia Sparks, Howard Sparks, Tabitha Carter, Howard Sparks, Jr., Michael Ray Sparks, Gary O. Spiers, Victoria Q. Spiers, and Julita A. Qualicio were Petitioners in the district court in No. 21-cv-126, as consolidated with No. 21-cv-420, and are Appellants before this Court in No. 23-7080.

Judith Abasi Mwila, Donte Akili Mwaipape, Victoria Akili Mwaipape, Elisha Donti Mwaipape, Joseph Donti Mwaipape, Debora Donti Mwaipape, Nko Donti Mwaipape, Monica Akili, Akili Musupape, Valentine Mathew Katunda, Abella Valentine Katunda, Venant Valentine Mathew Katunda, Desidery Valentine Mathew Katunda, Veidiana Valentine Katunda, Diana Valentine Katduna, Edwine Valentine Mathew Katunda, Angelina Mathew Felix, Edward Mathew Rutaheshelwa, Elizabeth Mathew Rutaheshelwa, Angelina Mathew Rutaheshelwa, Happiness Mathew Rutaheshelwa, Eric Mathew Rutaheshelwa, Enoc Mathew Rutaheshelwa, Angelina Mathew-Ferix, Mathew Ferix, Samuel Thomas Marcus, Cecilia Samuel Marcus, Coronella Samuel Marcus, Hanuni Ramadhani Nadange, Shabani Saidi Mutulya, Adabeth Said Nang'oko, and Kulwa Ramadhani were Petitioners in the district court in No. 21-cv-127, as consolidated with No. 21-cv-420, and are Appellants before this Court in No. 23-7080.

Rizwan Khaliq, Jenny Christina Lovblom, Imran Khaliq, Tehsin Khaliq, Kamran Khaliq, Imtiaz Bedum, Irfan Khaliq, Yasir Aziz, and Naurin Khaliq were Petitioners in the district court in No. 21-cv-128, as

consolidated with No. 21-cv-420, and are Appellants before this Court in No. 23-7080.

Estate of Jeremy Isadore Levin; Estate of Lucille Hare Levin; and Suzelle M. Smith, executrix of the Estate of Lucille Hare Levin and successor in interest to Jeremy Levin and Dr. Lucille Levin, were Plaintiffs in the district court in Nos. 05-cv-2494 and 21-cv-420 and are Appellants before this Court in No. 23-7082, which has been consolidated with No. 23-7080.

Wells Fargo Bank, N.A., was the Respondent in the district court in Nos. 21-cv-126, 21-cv-127, 21-cv-128, and Defendant in No. 21-cv-420 and is an Appellee before this Court in Nos. 23-7080 and 23-7082.

The United States of America was an Intervenor in the district court in Nos. 21-cv-126, 21-cv-127, 21-cv-128, 05-cv-2494, and 21-cv-420 and is an Appellee before this Court in Nos. 23-7080 and 23-7082.

## II. *Amici Curiae*

No *amici* participated in the district court proceedings. The Court has entered an order allowing Crystal Holdings Limited to appear as an *amicus curiae*.

## III.   Rulings Under Review

The rulings under review are the Minute Order of June 16, 2023, dismissing the consolidated proceedings without prejudice, and the Order and Memorandum Opinion of June 1, 2023 (ECF Nos. 35 and 36 in No. 21-cv-420 (Boasberg, C.J.)), granting the United States' motion to quash Appellants' writs of attachment.

The rulings are not reported, but the Memorandum Opinion is available at 2023 WL 3750577.

## IV.   Related Cases

This matter was previously before this Court in the consolidated appeals of *Estate of Jeremy I. Levin v. Wells Fargo Bank, N.A.*, Nos. 21-7036, 21-7041, 21-7044, 21-7052, and 21-7053 (opinion issued Aug. 16, 2022, and reported at 45 F.4th 416).   There, the Court reversed the district court's holding that plaintiffs had not shown that the blocked funds at issue belonged to a terrorist party under the Terrorism Risk Insurance Act and concluded that the funds were attachable as the blocked assets of an instrumentality of Iran, and then remanded for further proceedings.

iv

*Estate of Jeremy I. Levin v. Wells Fargo Bank, N.A.*, No. 23-7082, is a related appeal from the same district court rulings at issue here that is currently pending before this Court and has been consolidated with this appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES................................................................................ i

GLOSSARY...........................................................................xv

INTRODUCTION.....................................................................1

JURISDICTIONAL STATEMENT..............................................5

STATUTES AND REGULATIONS ...........................................5

STATEMENT OF ISSUES .......................................................5

STATEMENT OF FACTS.........................................................8

I.     Congress Enacted The FSIA And TRIA To Provide Relief To Victims Of State-Sponsored Terrorism...........................................8

II.    Iran Illegally Routes Funds Through The United States..............10

III.   The Government Initiates Forfeiture Proceedings And Seeks To Block Victims From Attaching The Funds................................12

IV.    The District Court Grants The Government's Motion To Quash Victims' Writs And This Court Reverses ...........................15

V.     The District Court Grants The Government's Renewed Motion To Quash Victims' Writs On Other Grounds....................16

SUMMARY OF ARGUMENT....................................................17

STANDARD OF REVIEW .......................................................21

ARGUMENT..........................................................................21

I.     TRIA Entitles Victims To Attach And Execute Upon The Funds ................................................................................22

A.    The Funds Remain Blocked Assets Subject To Attachment Under TRIA ........................................................ 22

B.    The Prior Exclusive Jurisdiction Doctrine Does Not Invalidate Victims' Writs ........................................... 34

II.    The FSIA Entitles The Owens Victims To Attach And Execute Upon The Iranian Funds ............................................... 52

A.    The Funds Were Used For A Commercial Activity In The United States ........................................................ 54

B.    The Prior Exclusive Jurisdiction Doctrine Does Not Apply .......................................................................... 58

C.    The Government's Forfeiture Action Does Not Bar Attachment Here ............................................................ 58

III.    TRIA And The FSIA Have Not Been Repealed *Sub Silentio* ........ 61

CONCLUSION ......................................................................... 64

CERTIFICATE OF COMPLIANCE .............................................. 65

CERTIFICATE OF SERVICE ...................................................... 66

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011)............................................................18, 35, 36, 37

*Arizona v. California*,
  373 U.S. 546 (1963)................................................................................37

*Bank Markazi v. Peterson*,
  578 U.S. 212 (2016).............................................................................8, 40

*Bank of N.Y. v. Rubin*,
  2006 WL 633315 (S.D.N.Y. Mar. 15, 2006) .......................................31

*Bank of New York v. Rubin*,
  484 F.3d 149 (2d Cir. 2007)....................................................30, 31, 32

*Bennett v. Islamic Republic of Iran*,
  618 F.3d 19 (D.C. Cir. 2010)................................................................21

*Bennett v. Islamic Republic of Iran*,
  825 F.3d 949 (9th Cir. 2016) ...............................................................42

*Brown v. United Airlines, Inc.*,
  720 F.3d 60 (1st Cir. 2013).....................................................43, 44, 45

*Caspary v. La. Land & Expl. Co.*,
  707 F.2d 785 (4th Cir. 1983) ...............................................................44

*Chapman v. Deutsche Bank Nat'l Tr. Co.*,
  651 F.3d 1039 (9th Cir. 2011) .............................................................47

*City of Milwaukee v. Illinois*,
  451 U.S. 304 (1981)...............................................................................35

*Colo. River Water Conservation Dist. v. United States*,
  424 U.S. 800 (1976)............................................................................6, 46

*Crowley Caribbean Transp., Inc. v. United States*,
  865 F.2d 1281 (D.C. Cir. 1989)............................................................38

*District of Columbia v. Brady*,
  288 F.2d 108 (D.C. Cir. 1960)............................................................42

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
  777 F.3d 518 (D.C. Cir. 2015)............................................................23

*Espat v. Espat*,
  56 F. Supp. 2d 1377 (M.D. Fla. 1999)................................................50

*Est. of Levin v. Wells Fargo Bank, N.A.*,
  45 F.4th 416 (D.C. Cir. 2022) ..................................2, 3, 8, 16, 22, 39, 53

*Exxon Shipping Co. v. Baker*,
  554 U.S. 471 (2008)............................................................................42

*Flatow v. Islamic Republic of Iran*,
  76 F. Supp. 2d 16 (D.D.C. 1999)........................................................57

*Fraenkel v. Islamic Republic of Iran*,
  326 F.R.D. 341 (D.D.C. 2018)............................................................63

*George v. Com. Credit Corp.*,
  440 F.2d 551 (7th Cir. 1971) ............................................................44

*Greenbaum v. Islamic Republic of Iran*,
  67 F.4th 428 (D.C. Cir. 2023) ................................................5, 38, 39, 41

*Greenblatt v. Drexel Burnham Lambert, Inc.*,
  763 F.2d 1352 (11th Cir. 1985) ........................................................44

*Hammer v. U.S. Dep't of Health & Hum. Servs.*,
  905 F.3d 517 (7th Cir. 2018) ............................................................48

*Heiser v. Islamic Republic of Iran*,
  735 F.3d 934 (D.C. Cir. 2013)......................................................22, 53

*Estate of Heiser v. Islamic Republic of Iran*,
  807 F. Supp. 2d 9 (D.D.C. 2011)........................................................31

ix

*Howard v. Pritzker*,
    775 F.3d 430 (D.C. Cir. 2015)..............................................................61

\*In re Islamic Republic of Iran Terrorism Litig.,
    659 F. Supp. 2d 31 (D.D.C. 2009)......................................8, 9, 10, 61

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
    563 U.S. 1 (2011)...................................................................................44

*King v. Dole*,
    782 F.2d 274 (D.C. Cir. 1986).......................................................41, 42

\*Kirschenbaum v. 650 Fifth Ave.,
    2017 WL 8640248 (S.D.N.Y. May 15, 2017)................................28, 30

*Levin v. Islamic Republic of Iran*,
    523 F. Supp. 3d 14 (D.D.C. 2021).......................................................15

*MidCap Funding XLII Tr. v. Birch Hill Real Est., LLC*,
    2019 WL 3281280 (E.D. Wis. July 19, 2019).....................................49

*Ministry of Def. & Support for the Armed Forces of the
Islamic Republic of Iran v. Elahi*,
    556 U.S. 366 (2009)..............................................................................40

*Montville Twp. v. Woodmont Builders, LLC*,
    244 F. App'x 514 (3d Cir. 2007)..........................................................44

*Mwani v. Al Qaeda*,
    2021 WL 5800737 (D.D.C. Dec. 7, 2021) ..........................................24

*NLRB v. SW Gen., Inc.*,
    580 U.S. 288 (2017)..............................................................................38

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994)................................................................................26

\*Owens v. Republic of Sudan,
    2021 WL 131446 (D.D.C. Jan. 14, 2021) .....................................15, 52

x

*Owens v. Republic of Sudan,
    826 F. Supp. 2d 128 (D.D.C. 2011)................................................11, 22

*Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader,
    294 U.S. 189 (1935)................................................46, 47, 51

Phila. & Reading Ry. Co. v. Marland,
    239 F. 1 (3d Cir. 1917)........................................................45

Princess Lida of Thurn & Taxis v. Thompson,
    305 U.S. 456 (1939)..............................................................48

Republic Nat'l Bank of Miami v. United States,
    506 U.S. 80 (1992)..........................................................59, 60

*Republic of Argentina v. Weltover, Inc.,
    504 U.S. 607 (1992).......................................................55, 57

Resol. Tr. Corp. v. Miramon,
    22 F.3d 1357 (5th Cir. 1994) ...............................................44

Rios v. Nicholson,
    490 F.3d 928 (Fed. Cir. 2007)..............................................44

Rubin v. Islamic Republic of Iran,
    138 S. Ct. 816 (2018).......................................................8, 42

Saudi Arabia v. Nelson,
    507 U.S. 349 (1993).............................................................54

Savage Servs. Corp. v. United States,
    25 F.4th 925 (11th Cir. 2022)..............................................42

Shamrock Farms Co. v. Veneman,
    146 F.3d 1177 (9th Cir. 1998) ........................................43, 44

Smentek v. Dart,
    683 F.3d 373 (7th Cir. 2012) ...............................................49

Thomas v. Contoocook Valley Sch. Dist.,
    150 F.3d 31 (1st Cir. 1998)..................................................37

*TIG Ins. Co. v. Republic of Argentina,
  967 F.3d 778 (D.C. Cir. 2020)...................................................55, 56, 57

TRW Inc. v. Andrews,
  534 U.S. 19 (2001).................................................................................26

United Airlines, Inc. v. Mesa Airlines, Inc.,
  219 F.3d 605 (7th Cir. 2000) ...............................................................43

United States v. $270,000.00 in U.S. Currency, Plus Int.,
  1 F.3d 1146 (11th Cir. 1993) ...............................................................47

*United States v. $79,123.49 in U.S. Cash & Currency,
  830 F.2d 94 (7th Cir. 1987) ...........................................................46, 47

*United States v. All Funds on Deposit with R.J. O'Brien &
  Assocs., 783 F.3d 607 (7th Cir. 2015).....................24, 27, 29, 31, 32, 33

United States v. Bank of N.Y. & Tr. Co.,
  296 U.S. 463 (1936)...............................................................................48

United States v. City of New Britain,
  347 U.S. 81 (1954).................................................................................45

*United States v. Holy Land Foundation for Relief &
  Development, 722 F.3d 677 (5th Cir. 2013) .............................31, 32, 33

United States v. Lahey Clinic Hosp., Inc.,
  399 F.3d 1 (1st Cir. 2005).....................................................................35

United States v. One 1985 Cadillac Seville,
  866 F.2d 1142 (9th Cir. 1989) .......................................................36, 50

United States v. PetroSaudi Oil Services (Venezuela) Ltd.,
  70 F.4th 1199 (9th Cir. 2023)...............................................................37

Usoyan v. Republic of Turkey,
  6 F.4th 31 (D.C. Cir. 2021)...................................................................21

Wabash R.R. Co. v. Adelbert Coll. of W. Rsrv. Univ.,
  208 U.S. 38 (1908).........................................................................46, 47

*Wada v. U.S. Secret Serv.*,
   525 F. Supp. 2d 1 (D.D.C. 2007)............................................................36

*Wyatt v. Syrian Arab Republic*,
   83 F. Supp. 3d 192 (D.D.C. 2015).........................................................30

*Yount v. Acuff Rose-Opryland*,
   103 F.3d 830 (9th Cir. 1996) .................................................................44

**Statutes**

3 U.S.C. § 301 .........................................................................................24

18 U.S.C. § 981 ................................................17, 18, 36, 37, 39, 58, 59, 60

22 U.S.C. § 287c.......................................................................................25

28 U.S.C. § 1291 ........................................................................................5

28 U.S.C. § 1330 ........................................................................................5

28 U.S.C. § 1355 ......................................................................................37

28 U.S.C. § 1603 ......................................................................................54

28 U.S.C. § 1605A ......................................................................5, 9, 11, 53

*28 U.S.C. § 1610...............................................5, 7, 8, 9, 10, 20, 53, 54, 57

*28 U.S.C. § 1610 Note......................................................................................
   ..................... 2, 4, 5, 6,  8, 9, 10, 16, 17, 19, 22, 23, 24, 26, 29, 32, 38, 41

*34 U.S.C. § 20144.............................................................................7, 62, 63

50 U.S.C. § 1702 ...............................................................................24, 25

D.C. Code § 16-507...................................................................................33

**Regulations**

31 C.F.R. § 535.579...................................................................................30

*31 C.F.R. § 594.307..................................................................................27

*31 C.F.R. § 594.502.................................................................24, 28

31 C.F.R. § 594.509...................................................................27

31 C.F.R. § 594.802...................................................................24

Exec. Order No. 13,224, 3 C.F.R. § 786 (2002) ...........................12, 24, 25

Exec. Order No. 13,886, 84 Fed. Reg. 48,041 (Sept. 9, 2019).................12

**Rules**

D.D.C. Local Civ. R. 40.5............................................................49

Fed. R. Civ. P. Supp. R. G ........................................................60

**Other Authorities**

148 Cong. Rec. H8728 (Nov. 13, 2002) ......................................9

*American Heritage Dictionary* 1412 (4th ed. 2000) ...............................43

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012).......................................38

*Black's Law Dictionary* (7th ed. 1999) ....................................43

*Black's Law Dictionary* (11th ed. 2019) ...........................................33, 60

*Restatement (Second) of Judgments* (1982) ............................................34

U.S. Victims of State Sponsored Terrorism Fund, http://www.usvsst.com (last updated Nov. 14, 2023).........................62

*Webster's Third New International Dictionary* (2021) ...........................43

Wright & Miller, *Federal Practice and Procedure* (3d ed. updated 2022)...................................................................47, 48

# GLOSSARY

| | |
|---|---|
| FSIA | Foreign Sovereign Immunities Act, codified at Title 28, §§ 1330, 1332, 1391, 1441, and 1602-1611 of the United States Code |
| IEEPA | International Emergency Economic Powers Act, codified at 50 U.S.C. § 1701 *et seq.* |
| JA | Joint Appendix |
| OFAC | U.S. Department of the Treasury's Office of Foreign Assets Control |
| TRIA | Terrorism Risk Insurance Act, Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2022) (codified as amended at 28 U.S.C. § 1610 Note (2012)) |

**INTRODUCTION**

Time and again Congress has reiterated that victims of terrorism should be able to recover for the atrocities they have suffered. It provided victims of terrorism a unique cause of action against state sponsors of terrorism and passed multiple statutes opening pathways for recovery of judgments against terrorist states. The most important of these latter enactments is the Terrorism Risk Insurance Act ("TRIA"), which allows victims of state-sponsored terrorism to execute their judgments against blocked assets of terrorist states. Congress has also amended the Foreign Sovereign Immunities Act ("FSIA") to allow victims to execute against assets of terrorist states that are located in the United States and used for commercial activity.

Despite Congress's clear desire to smooth the road to recovery, victims of terrorism have been repeatedly stymied in their efforts to obtain even partial compensation. The nearly 90 Appellants here are direct victims and family members of victims (collectively, "Victims") of al Qaeda's 1998 bombings of the U.S. embassies in Kenya and Tanzania. In 2001, they began a grinding journey toward justice and compensation for their suffering. Victims proved to the district court that the Islamic

Republic of Iran provided material support for the bombings, and the district court awarded Victims judgments of compensatory damages totaling nearly $1 billion. But Iran has not paid a penny.

Part of the problem is the difficulty of finding attachable assets belonging to Iran, which has long been subject to U.S. sanctions. But executive officials and courts have set up additional roadblocks to recovery.

These proceedings—which come before the Court for a second time—arise from Victims' efforts to attach approximately $10 million ("Funds") held by Wells Fargo Bank, N.A. ("Wells Fargo") that were blocked by U.S. sanctions when agents of Iran attempted to send the Funds through the U.S. financial system to purchase an oil tanker, the *Nautic*. Although Victims initially obtained writs of attachment against the Funds under both TRIA and the FSIA, the government, which has its own forfeiture action against the Funds, has repeatedly moved to quash their writs, and the district court has obliged.

In the first set of appeals, the Court held that "the blocked funds were" "traceable to Iran" and were thus "under § 201(a) of the TRIA, 'the blocked assets of [a] terrorist party.'" *Est. of Levin v. Wells Fargo Bank,*

*N.A.*, 45 F.4th 416, 423-24 (D.C. Cir. 2022). The Court categorically rejected the government's arguments, accepted by the district court, that Iran did not have an ownership interest in the Funds that could allow Victims to attach them under TRIA, even though the entire "premise" for blocking and the "government's forfeiture action is that the funds are traceable to Iran." *Id.* at 423.

On remand, the district court accepted another set of arguments from the government—(1) that the Funds were not actually blocked under TRIA, because of a conditional license issued to the government to effectuate a yet-to-be-issued forfeiture order, and (2) regardless, that the government's forfeiture action should invalidate Victims' writs because of the prior exclusive jurisdiction doctrine, which normally operates where two different courts have competing jurisdiction over a *res*, not as here, where a single court (and single judge) has jurisdiction over competing suits involving the *res*. The district court further ruled that attachment under the FSIA similarly should give way to the government's forfeiture action.

These holdings are barred by the plain text of TRIA, the FSIA, and the forfeiture statute, as well as the plain terms of the government's

forfeiture license.  The district court would all but eliminate TRIA's powerful provision for attachment "[n]otwithstanding any other provision of law."  TRIA, § 201(a), 28 U.S.C. § 1610 Note (2012).  Most concerning, however, is the district court's overall conclusion—undergirding each of its holdings—that the pathways for attachment that Congress paved through TRIA and the FSIA are now closed.

According to the district court, Congress's creation of the U.S. Victims of State Sponsored Terrorism Fund ("Victims Fund")—which underscores Congress's commitment to compensation for victims of terrorism—means that Victims can no longer use TRIA and the FSIA to satisfy their judgments.  Although Congress has repealed neither TRIA nor the FSIA, in the district court's view, Congress's creation of the Victims Fund "cast[s] heavy doubt that it was Congress's intent to encourage … individual victims seeking to attach foreign funds that glance off the U.S. financial system."  JA427.  "[A]llowing [Victims'] actions to go forward," the district court believed, "would fundamentally undermine Congress's intended scheme for compensating victims of state-sponsored terrorism."  *Id.*  The district court's usurpation of Congress's role—deciding based on its own policy predilections which

4

statutes actually remain in force—must be rejected. The Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under the FSIA, 28 U.S.C. §§ 1330, 1605A, 1610, and Section 201 of TRIA, 28 U.S.C. § 1610 Note. On June 21, 2023, Victims timely appealed from (1) the district court's June 1, 2023, order quashing Victims' writs and constructively denying Victims' motion for condemnation and recovery and (2) the court's June 16, 2023, order dismissing the writ actions without prejudice. JA429-30. This Court has jurisdiction under 28 U.S.C. § 1291. *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 431 (D.C. Cir. 2023).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an Addendum.

## STATEMENT OF ISSUES

1. TRIA provides for attachment of "blocked assets" of terrorist parties but excludes from the definition of "blocked asset" any property that is "subject to a license issued by the United States Government for final payment … [where] such license has been specifically required by

statute *other than* the International Emergency Economic Powers Act" ("IEEPA").  TRIA, § 201(a), (d)(2)(B)(i) (emphasis added).  Here, after Victims obtained their writs of attachment, the United States obtained a license for transfer of the assets "[g]ranted under the authority of [IEEPA]" and "condition[ed] on the [government] furnishing a valid forfeiture order to the U.S. financial institution in possession of the [f]unds." JA290-91.  The first question is whether this conditional future license issued under IEEPA "unblocked" the assets for purposes of TRIA and thus precluded Victims from maintaining their writs.

2.    The prior exclusive jurisdiction doctrine provides that "the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other *courts*." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976) (emphasis added).  The second question is whether the government's earlier-filed forfeiture action against the blocked assets precludes Victims' later-filed writs against those assets under the prior exclusive jurisdiction doctrine, even though TRIA entitles terrorism victims to attach a terrorist party's assets "[n]otwithstanding any other provision of law,"  TRIA, § 201(a),

and Victims' writ actions were filed in the *same* district court as the forfeiture action and are pending before the *same* judge.

3.    The FSIA permits victims of terrorism with judgments against a state sponsor of terrorism "attachment" of the "property … of a foreign state … used for a commercial activity in the United States."  28 U.S.C. § 1610(a)(7).  The Supreme Court has long held that the purchase of goods is paradigmatic commercial activity.  Here, a terrorist agent sent funds into the United States to purchase an oil tanker, and the government initiated forfeiture proceedings against the assets.  The third question is whether the assets were used for a commercial activity and thus attachable under the FSIA, or whether the government's forfeiture action precludes FSIA attachment.

4.    In 2015, Congress enacted the U.S. Victims of State Sponsored Terrorism Fund, 34 U.S.C. § 20144, which provides an additional, albeit limited, pathway for victims of terrorism with judgments against state sponsors of terrorism to obtain compensation. The fourth question is whether by creating the Victims Fund, Congress *sub silentio* repealed its earlier enactments in TRIA and the FSIA.

7

## STATEMENT OF FACTS[1]

### I.  Congress Enacted The FSIA And TRIA To Provide Relief To Victims Of State-Sponsored Terrorism

The Foreign Sovereign Immunities Act "codif[ies] [a] careful balance between respecting the immunity historically afforded to foreign sovereigns and holding them accountable, in certain circumstances, for their actions." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018).  Section 1610(f)(1)(A) of the FSIA provides that judgment creditors of a terrorist state may attach property that has been blocked pursuant to sanctions.  28 U.S.C. § 1610(f)(1)(A).  But the statute allows the President to suspend this provision "in the interest of national security."  *Id.* § 1610(f)(3).  President Clinton did so in 2000, and the waiver remains in effect today.  *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 57 (D.D.C. 2009).

To address this and other "enforcement difficulties" terrorist victims experience, Congress enacted the Terrorism Risk Insurance Act. *Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016); *see* Pub. L. No. 107-

---

[1] Both this Court and the district court have previously summarized this litigation's procedural history.  *See Est. of Levin*, 45 F.4th at 417-20 (JA198-203); JA405-11; JA178-86.

297, § 210(a), 116 Stat. 2322, 2337 (Nov. 26, 2002), codified at 28 U.S.C. § 1610 Note.  TRIA was specifically intended "to deal comprehensively with the problem of enforcement of judgments rendered on behalf of victims of terrorism in any court of competent jurisdiction by enabling them to satisfy such judgments through the attachment of blocked assets of terrorist parties."   148 Cong. Rec. H8728 (Nov. 13, 2002).   Its enactment was "a victory for … terrorism victims … over the longstanding objections of the Executive Branch." *Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 58.

In 2008, Congress updated the FSIA by withdrawing immunity from designated "state sponsor[s] of terrorism" and creating a new federal cause of action against such states.  28 U.S.C. § 1605A.  TRIA was subsequently amended to confirm that victims with judgments under Section 1605A could attach blocked funds of the terrorist state, *see* TRIA, § 201(a), and Section 1610(a)(7) of the FSIA was amended to permit victims to execute upon property of the judgment debtor that is "used for a commercial activity in the United States," 28 U.S.C. § 1610(a)(7).  Congress further enacted Section 1610(g) of the FSIA to ensure that judgments under Section 1605A can be enforced against property of "an

agency or instrumentality" of the terrorist state, even if the property is regulated by sanctions laws. *Id.* § 1610(g).

> Today Section 201(a) of TRIA provides:

> Notwithstanding any other provision of law … in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section [1605A of the FSIA] … the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment … in order to satisfy such judgment[.]

In TRIA, "Congress finally succeeded in subjecting the assets of state sponsors of terrorism to attachment and execution in satisfaction of judgments under [the FSIA]." *Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 57. And its "additions to the FSIA demonstrate that Congress remains focused on eliminating those barriers that have made it nearly impossible for plaintiffs in these actions to execute civil judgments against Iran or other state sponsors of terrorism." *Id.* at 62.

## II.     Iran Illegally Routes Funds Through The United States

In 1998, al Qaeda carried out simultaneous suicide bombings of the U.S. embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing hundreds of people and injuring over a thousand others. JA179, 201. Victims, who suffered horribly as a result of the attacks, brought three

different suits against Iran pursuant to 28 U.S.C. § 1605A for its role in the bombings.[2]  In 2011, the district court (Bates, J.) found Iran "liable for damages suffered by [Victims]" because Iran "provided material aid and support to al Qaeda," *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011), and entered judgments against Iran totaling nearly $1 billion, JA179.  Iran has not paid a cent of those judgments. Accordingly, Victims have sought to attach and execute upon Iranian-owned funds held in the United States.  JA179-80, 183.

Attachable Iranian assets rarely surface in U.S. financial institutions, but an opportunity arose for Victims when Iran's Islamic Revolutionary Guard Corps–Qods Force sought to procure an oil tanker named the *Nautic* from non-party Crystal Holdings Limited.  *See* JA234-36.  The U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") has repeatedly designated the Revolutionary Guard a state

---

[2] Victims' suits against Iran were filed across three dockets in the district court: *Owens v. Republic of Sudan*, No. 01-cv-2244 (JA1-23); *Mwila v. Islamic Republic of Iran*, No. 08-cv-1377; and *Khaliq v. Republic of Sudan*, No. 10-cv-356.  The relevant procedural history is the same for all three cases, so only the original *Owens* docket (and the subsequent *Owens* docket created for this proceeding, *see infra* note 3) is cited herein.

sponsor of terrorism.  *See* Exec. Order No. 13,224 (Sept. 23, 2001), *as amended by* Exec. Order No. 13,886, 84 Fed. Reg. 48,041 (Sept. 9, 2019).

To purchase the *Nautic*, operatives of the Revolutionary Guard set up an Omani front company called Taif Mining Services, *see* JA229 ¶ 17, JA234 ¶ 43, JA278-80 ¶¶ 23-41, which is an undisputed "agent or instrumentality of Iran," JA180.  Taif, acting through an agent, successfully wired an initial deposit of $2,340,000 for the *Nautic* through the U.S. financial system to Crystal Holdings.  *Id.*  But when Taif tried to send the balance of the purchase price, $9,983,921.91, to Crystal Holdings in October 2019, Wells Fargo—which had been alerted to the possibility of an illicit transaction by OFAC—halted the transfer and reported it to OFAC.  *See* JA257-58, 269-71.  OFAC subsequently issued formal blocking orders under IEEPA.  JA269-71.  The Funds have remained at Wells Fargo ever since.  JA182.

## III.  The Government Initiates Forfeiture Proceedings And Seeks To Block Victims From Attaching The Funds

In May 2020, the United States filed a civil *in rem* forfeiture complaint against the Funds in the district court (Boasberg, C.J.). Complaint, *United States v. $2,340,000 Associated with Petroleum Tanker Nautic*, No. 20-cv-1139 (D.D.C. May 1, 2020) ("Forfeiture

Action"), ECF No. 1 (JA272-85). That same month, another judge of the same district court (Bates, J.) issued writs of attachment against the Funds to Victims. JA72-78.

Judge Bates reasoned that the Iranian Funds were attachable under TRIA because Taif is, "at minimum, an agency or instrumentality of a terrorist party," and that the Funds are "'blocked assets' because they were seized by the United States under [IEEPA]." JA77. Judge Bates also held that the Funds were attachable under the FSIA because they "were used for commercial activity in the United States [when they] were transmitted through the United States to purchase a petroleum tanker." *Id.* The Clerk issued writs of attachment against Wells Fargo, which Victims served. JA88-93. The returned, executed writs were filed on June 24, 2020, and the same day, Wells Fargo filed answers under seal confirming that it possessed the Funds. JA84-87. Victims timely moved for a judgment of condemnation and recovery and an order directing Wells Fargo to deliver the Funds to the Victims. JA94-96. Victims also filed a verified claim against the Funds in the government's forfeiture proceeding on June 30, 2020. Forfeiture Action, ECF No. 4.

In July 2020, *after* Victims secured their property interest in the Funds by serving their writs on Wells Fargo, and *after* Victims moved the district court for a judgment of condemnation and recovery, the government sought an OFAC license for its forfeiture action. JA287-88. The subsequently issued license states that it was "[g]ranted under the authority of [IEEPA]" and is "conditional" on the government "furnishing a valid forfeiture order" to Wells Fargo. JA290-91. Once that condition is met, it authorizes the government to "engage in all transactions necessary and ordinarily incident to effect the forfeiture" of the Funds. JA291. The parties agreed to pause the forfeiture action pending resolution of the issues in these proceedings; accordingly, to date, the government has not secured the forfeiture order that is the prerequisite to its license. *See* Forfeiture Action, Min. Order (Aug. 5, 2020); JA218, 220.

In August 2020, other plaintiffs with judgments against Iran (the "Levins") sought a writ of attachment against the Funds in separate proceedings. JA115-22. The United States intervened in both Victims' and the Levins' attachment proceedings and moved to quash the writs. JA183-84, 202. It also moved to sever and reassign Victims' and the

14

Levins' writ proceedings from Judge Bates and Judge Moss, respectively, to Judge Boasberg, who had jurisdiction over the forfeiture action. Judge Bates and Judge Moss granted the motions. JA184; *see also Owens v. Republic of Sudan*, 2021 WL 131446 (D.D.C. Jan. 14, 2021).[3]

## IV. The District Court Grants The Government's Motion To Quash Victims' Writs And This Court Reverses

The district court granted the United States' first motion to quash the writs in March 2021, holding that Iran lacked an ownership interest in the Funds sufficient for attachment under TRIA or the FSIA. *Levin v. Islamic Republic of Iran*, 523 F. Supp. 3d 14 (D.D.C. 2021). Victims and the Levins both appealed, arguing that the Funds were blocked assets and property "of" Iran under both TRIA and the FSIA. *See, e.g.*, Owens *et al.* Opening Br., *Est. of Levin v. Wells Fargo Bank, N.A.*, No. 21-7036 (D.C. Cir. Nov. 15, 2021).

This Court agreed with Victims and held that the Funds were assets "of" Iran because they were traceable to Taif "and thus to Iran."

---

[3] Simultaneously, Victims' attachment and turnover proceedings were severed from the main actions, *see* JA161-74, and assigned to new dockets: *Owens v. Wells Fargo Bank, N.A.*, No. 21-cv-126 (D.D.C.) (JA34-41); *Mwila v. Wells Fargo Bank, N.A.*, No. 21-cv-127 (D.D.C.) (JA42-47); and *Khaliq v. Wells Fargo Bank, N.A.*, No. 21-cv-128 (D.D.C.) (JA48-53).

*Est. of Levin*, 45 F.4th at 417, 423-24.  Accordingly, "under § 201(a) of the TRIA," the funds were "'the blocked assets of [a] terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party).'"  *Id.* (alteration in original).  The Court reversed the district court's judgment and remanded without addressing other issues.  *Id.*

## V.   The District Court Grants The Government's Renewed Motion To Quash Victims' Writs On Other Grounds

On remand, with the question of Iran's property interest in the Funds settled, the government renewed its motion to quash the writs of attachment on different grounds.  The district court again stayed the forfeiture action during proceedings on the renewed motion to quash the writ actions.  Forfeiture Action, ECF No. 20.  The district court then consolidated the Levins' and Victims' writ proceedings under a single docket, *Est. of Levin v. Wells Fargo Bank, N.A.*, No. 21-cv-420 (D.D.C.). JA219-21.

On June 1, 2023, the district court granted the government's renewed motion to quash.  JA403.  The court concluded (1) that the Funds were not "blocked assets" for purposes of TRIA because of the government's OFAC license for its forfeiture action, JA412-16; (2) that TRIA's "notwithstanding" clause does not override the prior-exclusive-

16

jurisdiction doctrine and that the doctrine applies to two suits pending before the same court, such that the government's earlier forfeiture action bars Victims' writs under both TRIA and the FSIA, JA416-21; (3) that the civil forfeiture statute, 18 U.S.C. § 981(c), also precludes attachment under the FSIA, JA422-24; and (4) that the Funds do not satisfy the FSIA's commercial activity requirement, JA424-27.

The district court dismissed the writ actions without prejudice, JA62, and Victims timely appealed, JA429.

## SUMMARY OF ARGUMENT

Contrary to the district court's decision, the Funds remain blocked under TRIA. The statute's plain text excludes assets subject to certain licenses from its definition of "blocked asset," *i.e.*, licenses that are issued under a statute "other than" IEEPA. TRIA, § 201(d)(2)(B)(i). But the government's license indisputably was issued under authority of IEEPA, and thus does not fall within the exception. The district court's conclusion that the government's license nonetheless generally unblocked the Funds under IEEPA must be rejected. It ignores the distinction between general and specific licenses, the relevant regulations, and the plain terms of the license—which only authorizes

17

transactions "necessary" "to effect the forfeiture" and otherwise preserves the prohibition on "transfer of" the "blocked property." JA291. Moreover, the license is not yet even operative—it is "conditional" on "a valid forfeiture order," *id.*, which has never been issued (the forfeiture action remains at an early stage and has been stayed in deference to these proceedings).

The district court's alternative holding—that the writs were barred by the prior exclusive jurisdiction doctrine—also must be rejected. Although the district court recognized that the forfeiture statute itself has a provision that is "admittedly quite similar to that of the prior-exclusive-jurisdiction doctrine," JA422, which bars other courts from issuing orders regarding property that has been detained in a forfeiture action, *see* 18 U.S.C. § 981(c), it failed to realize the obvious corollary—the forfeiture statute "speaks directly" to the same issue as the prior exclusive jurisdiction doctrine and thus displaces it, *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011) ("*AEP*").

The district court implicitly recognized that TRIA's specification of attachment "notwithstanding any other provision of law" necessarily overrides the forfeiture statute's exclusive jurisdiction provision. *See*

18

JA422.  But it somehow concluded that even though the forfeiture statute (which, as discussed, displaces the prior exclusive jurisdiction doctrine) is itself overridden by TRIA, the prior exclusive jurisdiction can be resurrected to invalidate Victims' writs and cannot be overcome by TRIA. The district court's holding curtails TRIA's "[n]otwithstanding" clause—which extends to both statutory enactments and "provision[s]" of common law.  TRIA, § 201(a).  In reaching the opposite conclusion, the district court ignored this Court's precedent, cherrypicked dictionary definitions, and overlooked the long history of established judicial usage.

In any event, even if the prior exclusive jurisdiction doctrine is not foreclosed by TRIA, its application does not bar Victims' writs here.  The doctrine was developed to address situations where two *different* courts exercised jurisdiction simultaneously over property.   For reasons of comity and orderliness, the common law concluded that the second court to obtain jurisdiction must cede its jurisdiction in deference to the first court.  Here, Victims' writ proceedings and the forfeiture action were pending in the same court, and in fact, reassigned to the same judge. Thus, there was no risk of competing or contradictory orders regarding the Funds, and the doctrine has no application.  The district court's

unfounded extension of the doctrine to suits before the same court would transform the doctrine from a rule of jurisdictional comity to a rule of priority on the merits—such that a first-filed suit will always prevail over a second-filed suit, irrespective of the strength of their claims. This novel and illogical expansion should be rejected.

The FSIA provides an independent basis for attachment. The district court's holding that the Funds—which were sent through the commercial banking system to complete the purchase of an oil tanker—do not constitute foreign state property "used for a commercial activity," 28 U.S.C. § 1610(a)(7), contradicts this Court's precedent and is belied by the record. And just as the prior exclusive jurisdiction doctrine does not bar Victims' writs—because they were pending in the same court as the forfeiture action—so too the forfeiture action's vesting of jurisdiction in a single court does not bar Victims' writs.

Finally, the district court's unprecedented conclusion that Congress *sub silentio* repealed TRIA and the provisions of the FSIA providing for attachment by enacting the Victims Fund must be rejected. The Victims Fund only underscores Congress's commitment to providing victims of terrorism with pathways for recovery. It does not invalidate Congress's

separate and prior enactments authorizing victims of terrorism to obtain individual attachments of terrorist assets to satisfy their judgments. The district court cannot pick and choose which statutes remain in force.

## STANDARD OF REVIEW

The district court's interpretation of TRIA and the FSIA are questions of law that this Court reviews *de novo*. *See Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010) ("Whether the properties are subject to attachment [under TRIA] is a question of law that we review de novo."); *Usoyan v. Republic of Turkey*, 6 F.4th 31, 38 (D.C. Cir. 2021) (reviewing *de novo* the district court's interpretation of the FSIA).

## ARGUMENT

Victims have satisfied the requirements for attachment under both TRIA and the FSIA. The district court's contrary conclusion misread and misapplied those statutes, and its reasoning would hinder Congress's efforts to afford victims of state-sponsored terrorism meaningful opportunities for justice.

21

## I.    TRIA Entitles Victims To Attach And Execute Upon The Funds

TRIA provides that "in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism," "the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution."  TRIA, § 201(a).  The Owens Victims hold valid judgments against Iran, a "terrorist party" within the meaning of TRIA, § 201(d)(4), *see Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 937 (D.C. Cir. 2013), for its role in two heinous "act[s] of terrorism": the 1998 embassy bombings in Kenya and Tanzania, *Owens*, 826 F. Supp. 2d at 132-33, 139.  They are thus entitled to attach and execute on the Funds, which are blocked under IEEPA, "[n]otwithstanding any other provision of law" on which the government might rely.  TRIA, § 201(a).

### A.    The Funds Remain Blocked Assets Subject To Attachment Under TRIA

This Court has already held that, "[i]n terms of the TRIA, … the [Iranian Funds] represen[t] 'blocked assets of [a] terrorist party,'" making them attachable under TRIA.  *Est. of Levin*, 45 F.4th at 423 (last

alteration in original).  The district court, however, reopened that issue on remand, ruling that the Funds are no longer blocked because, after Victims attached the Funds, the government obtained a conditional OFAC license authorizing it to effectuate a future final disposition of its forfeiture action against the Funds.  JA412-16.  Neither law nor fact supports that conclusion.

1.    This Court can, and should, "begi[n] and en[d] with [TRIA's] text," *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 523 (D.C. Cir. 2015), which squarely precludes the district court's reading of the statute.  TRIA permits the holder of a judgment against a terrorist party to attach "the blocked assets of that terrorist party" in satisfaction of the judgment.  TRIA, § 201(a).  The statute defines "blocked asset" broadly to encompass "*any asset* seized or frozen by the United States" under IEEPA or the Trading With the Enemy Act.  *Id.* § 201(d)(2)(A) (emphasis added).  While certain licensed property is excluded from this definition, the government's license is not encompassed within the exclusion.  Under TRIA, a "blocked asset" "does not include property that … is subject to a license … for final payment, transfer, or disposition … [where] such license has been *specifically required* by [a] statute *other*

*than* [IEEPA] or the United Nations Participation Act." *Id.* § 201(d)(2)(B)(i) (emphases added). TRIA thus allows "[o]nly licenses that meet specific requirements"—including issuance under statutes *other than* IEEPA—to "unblock" frozen funds. *Mwani v. Al Qaeda*, 2021 WL 5800737, at *14 & n.19 (D.D.C. Dec. 7, 2021).[4]

Here, the Funds were indisputably blocked under IEEPA. JA271 (blocking Funds under "section 203 of [IEEPA], 50 U.S.C. § 1702").[5] Thus, it is IEEPA that "specifically require[s]" an order or license to authorize an otherwise prohibited transaction. TRIA, § 201(d)(2)(B)(i); *see* 31 C.F.R. § 594.502(c) (a "license authorizing any transaction otherwise prohibited under this part has the effect of removing a prohibition contained in this part from the transaction"); *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 628,

---

[4] The district court, following the government's lead, cited *Mwani* to support its view that the issuance of *any* license unblocks frozen funds, JA413, but ignored this crucial language that directly undercuts its holding.

[5] In addition to IEEPA, the blocking memoranda also refer to Executive Order 13,224, 3 C.F.R. § 786 (2002), which was issued pursuant to IEEPA, and cite to 3 U.S.C. § 301, which allows the President to delegate authority to executive officials, and 31 C.F.R. § 594.802, which delegates to OFAC the Secretary of the Treasury's authority to implement Executive Order 13,224. JA269-71.

630 (7th Cir. 2015) (Manion, J., concurring in part and dissenting in part) (where funds are blocked under IEEPA, to be "valid," a license authorizing forfeiture must be issued "under IEEPA"). And unsurprisingly, the government's license states that it was "[g]ranted under the authority" of IEEPA. JA290 (citing "50 U.S.C. §§ … 1701-06" and "Executive Order 13224" as "authority"). Because the government's license for the completion of its forfeiture action was required by and issued under IEEPA, it does not exclude the Funds from TRIA's definition of "blocked asset."[6]

The district court's contrary conclusion, JA415-16, would make a mockery of the text. TRIA provides a clear definition for "blocked asset," which the Funds meet, and the government's license does not change

---

[6] In full, the license uses default language explaining that it was "[g]ranted under the authority *of one or more* of 50 U.S.C. §§ 1601-51, 1701-06, 22 U.S.C. § 287c, Executive Order 13224 as amended, and 31 C.F.R. parts 501 and 594." JA290 (emphasis added). Since the Funds were blocked pursuant to IEEPA (50 U.S.C. § 1702) and Executive Order 13,224 (itself issued under IEEPA), with no mention of the other authorities listed in the license (*i.e.*, the National Emergencies Act, 50 U.S.C. §§ 1601-1651, which allows the President to declare national emergencies, or the United Nations Participation Act, 22 U.S.C. § 287c, which imposes economic and communications sanctions), JA268-71, it follows that these are also the authorities under which they are licensed.

that.  By excluding assets that are licensed by statutes "other than" IEEPA from the definition of "blocked asset," TRIA necessarily implies that assets licensed under IEEPA are still "blocked" for purposes of TRIA.[7] *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (citation omitted)).  In effect, the district court grafted a new exclusion for assets licensed under IEEPA onto TRIA's definition of "blocked asset."  The Court should reject such revision of the statutory text.  *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86-87 (1994) ("[t]o create additional … exceptions" to a statutory definition beyond those expressly contemplated "is not to 'supplement' th[e] [statutory] scheme, but to alter it").

**2.**  The district court posited that the license, as a practical matter, unfroze the Funds under IEEPA, putting them outside the reach of TRIA.

---

[7] With good reason—otherwise a forfeiture action, which is common against blocked funds and necessarily requires a license to be effectuated—would always override writs under TRIA, running afoul of TRIA's "[n]otwithstanding any other provision of law" clause.  TRIA, § 201(a); *see infra* pp. 38-39.

JA416 ("OFAC's license … means that the assets are no longer frozen under IEEPA to begin with."). But that is a gross misreading of the both the license and the regulatory scheme.

The district court's conclusion that the Funds are no longer frozen ignored the distinction between a general and specific license, as well as the terms of the license. *See* JA413, 415-16. "A general license … is … a regulation preventing assets from being blocked in the first place." *R.J. O'Brien*, 783 F.3d at 632-33 (Manion, J., concurring in part and dissenting in part); *see* 31 C.F.R. § 594.307(b) (defining "general license"). Such regulation removes an entire category of transactions from the scope of blocking orders and regulations. *See, e.g.*, 31 C.F.R. § 594.509 (general license allowing "transactions … incident to … transmission of [personal] mail" with a "person whose property … [is] blocked"). In contrast, a specific license is issued for a particular, limited purpose—it usually authorizes a specific transaction that is otherwise barred under a blocking order or regulation. *See R.J. O'Brien*, 783 F.3d at 632 (Manion, J., concurring in part and dissenting in part). Because of their limited scope and applicability, specific licenses are not set forth in regulation. *See* 31 C.F.R. § 594.307(c) (defining "specific license").

Crucially, under a regulation that the district court ignored, any license "authorizing" a "transaction otherwise prohibited … has the effect of removing [the] prohibition … from the transaction, but *only to the extent specifically stated by its term*s."  31 C.F.R. § 594.502(c) (emphasis added).  Thus, the "mere fact that a license [w]as issued with regard to some aspect of a property" "does not 'unblock' the property" more generally.  *Kirschenbaum v. 650 Fifth Ave.*, 2017 WL 8640248, at *3 (S.D.N.Y. May 15, 2017).

By assuming that the government's license categorically unfroze the Funds under IEEPA, JA416, the district court overlooked both this regulation and the language of the license.  The specific license issued by OFAC here conditionally lifts a single aspect of the block for a particular and limited purpose—it does not unblock the Funds categorically.  The license authorizes the government to "engage in all transactions necessary and ordinarily incident to effect the forfeiture" of the Iranian Funds.  JA291.  By its very terms, it does not "authorize transactions … other than those listed" in the license.  JA290.  And the license preserves the prohibition on any other "transfer of" or "execution of any judgment against" the "blocked property."  JA291.  In other words, although "*the*

28

*funds [a]re still blocked under IEEPA*, the license allow[s] the forfeiture action to proceed" in the future. *R.J. O'Brien*, 783 F.3d at 631 (Manion, J., concurring in part and dissenting in part).

The district court's contrary conclusion is nonsensical—if the Funds "are no longer frozen under IEEPA," JA416, then OFAC's blocking order prohibiting the Funds from being "transferred, paid, exported, withdrawn, or otherwise dealt in," JA271, is no longer in effect, and the court could allow Wells Fargo to send them back to Iran or forward them on to Crystal Holdings. Surely, that is not the government's position.

**3.** The government's OFAC license also does not unblock the Funds for a simple reason the district court failed to address: TRIA requires that any license unblocking assets provide for the "final payment, transfer, or disposition" of the assets, and the government's license does not do so at this time. TRIA, § 201(d)(2)(B)(i). The license, which was issued after Victims obtained their writs, is not yet operative; it is "conditional on the [government] furnishing a valid forfeiture order to the U.S. financial institution in possession of the [f]unds." JA291. The forfeiture action, which is still in its early stages and has been stayed pending the outcome of this litigation, is far from resulting in a final

order of forfeiture.  Forfeiture Action, Min. Order (June 16, 2023).  Thus, the license does not currently provide for "final" disposition of the Funds.

Accordingly, the "[l]icense, by its plain terms, does not 'unblock'" the Funds under TRIA; it provides for a future, partial unblocking only for the limited purpose of completing forfeiture proceedings, and only once the required condition—a valid forfeiture order—is met. *Kirschenbaum*, 2017 WL 8640248, at *9; *e.g.*, *id.* at *8 (upholding writs because license "d[id] *not* say that the [assets being attached] are no longer 'blocked' for the purposes of TRIA").[8]

4.    The cases cited by the district court to support its contrary conclusion are inapt.  JA413.  The district court looked to the Second Circuit's decision in *Bank of New York v. Rubin*, JA413-15, but that case held that assets "subject to the general license of 31 C.F.R. § 535.579," which "authorized" "[t]ransactions" involving Iranian property entering the United States after 1981, "are not blocked assets under the TRIA,"

---

[8] The current inoperability and limited nature of the license also distinguishes this case from *Wyatt v. Syrian Arab Republic*, cited at JA413, where the license allowed the holder of the assets to "process [a previously blocked funds] transfer in accordance with the original payment instructions" "without further OFAC intervention," directly unblocking the assets in full.  83 F. Supp. 3d 192, 197 (D.D.C. 2015).

484 F.3d 149, 150 (2d Cir. 2007) (per curiam).  The funds at issue in *Rubin* entered the country after that date and thus "were never blocked." *Bank of N.Y. v. Rubin*, 2006 WL 633315, at \*4, \*8 (S.D.N.Y. Mar. 15, 2006); *see R.J. O'Brien*, 783 F.3d at 632 (Manion, J., concurring in part and dissenting in part).[9]

The district court's citation of *Estate of Heiser v. Islamic Republic of Iran* was similarly misplaced; that decision also concerned a "general license" that "permitt[ed] payments incident to telecommunications traffic" and provided for repeated payments between commercial entities, such that the funds were always "unblocked and not subject to attachment."  807 F. Supp. 2d 9, 16-17, 18 n.6 (D.D.C. 2011).  The district court's failure to appreciate the distinction between general and specific licenses undercuts its reliance on *Rubin* and *Heiser*.

The Fifth Circuit in *United States v. Holy Land Foundation for Relief & Development*, like the district court here, derived its erroneous

---

[9] Although the Second Circuit inartfully stated that the funds were "blocked" under executive order before stating that they were not "blocked" because of the license, 484 F.3d at 150, the district court's explanation—embraced by the Second Circuit, *id.*—that they were "never blocked," 2006 WL 633315, at \*8, is the accurate formulation.

holding that blocked assets restrained in a forfeiture action under a specific license from OFAC were not attachable under TRIA from *Rubin* and *Estate of Heiser* without making any distinction—or even analyzing the differences—between general and specific licenses.  722 F.3d 677, 687 (5th Cir. 2013).

The Seventh Circuit, in turn, in *R.J. O'Brien* relied heavily on *Holy Land* and likewise cited both *Rubin* and *Estate of Heiser*.  783 F.3d at 624-26.  The Seventh Circuit attempted to address the issue by positing that TRIA's text "makes no distinction between—or mention of—'specific' or 'general' licenses." *Id.* at 626.  It observed that TRIA "broadly excepts any property subject to '*a license*' … from qualifying as a blocked asset." *Id.*  But the text *does* require that assets be "seized or frozen by the United States," TRIA, § 201(d)(2)(A); assets already subject to a general license never fall into that category.  Moreover, as the Seventh Circuit conceded, "property subject to '*a license*'" is excepted from the definition of blocked asset only "subject to certain conditions." *R.J. O'Brien*, 783 F.3d at 626.  One of these conditions, of course, is that the license is "specifically required by statute *other than*" IEEPA, which is not the case here.  TRIA, § 201(d)(2)(B)(i) (emphasis added).  In contrast, in *R.J.*

*O'Brien*, the plaintiffs made "no argument" that the license was required by IEEPA, and the Seventh Circuit "deemed" the "issue" "waived." 783 F.3d at 624.

*Holy Land* and *R.J. O'Brien* are further afield because, in both of those cases, the government obtained OFAC licenses and took or restrained the funds in forfeiture actions *before* the plaintiffs received underlying judgments permitting attachment. In *Holy Land*, the United States obtained an OFAC license and judicial restraining order (authorized by the license) against the assets in its forfeiture action "several days" before the plaintiffs "received their civil judgment," let alone sought attachment. 722 F.3d at 686. And in *R.J. O'Brien*, "after securing the OFAC license, the United States *arrested and took possession* of the funds" "six months" before the plaintiffs received underlying judgments. 783 F.3d at 615, 624 (emphasis added).

Here, by contrast, Victims obtained judgments *and* secured writs of attachment *before* the government obtained (or even requested) its OFAC license. *See* JA78, 88, 287-88, 290. That attachment created a "lien," D.C. Code § 16-507(b), securing Victims' "legal right or interest" in the property, *Black's Law Dictionary* (11th ed. 2019) (defining "lien"), before

33

the government's license was issued, *see Restatement (Second) of Judgments* § 6 cmt. b (1982) ("lien upon property ordinarily survives transfer of the thing and is superior to subsequent liens and claims"). To date, the government has not taken possession of the Funds, and it is questionable whether they are even restrained in the forfeiture proceeding, *see infra* pp. 59-60.

The district court failed to appreciate these vital differences and further compounded the Fifth and Seventh Circuits' errors by extending them to new factual circumstances. This Court should reject that holding and conclude that, in light of TRIA's plain meaning and the clear text of the government's license, the Funds remain blocked assets of Iran and valid targets of Victims' attachments under TRIA.

### B.    The Prior Exclusive Jurisdiction Doctrine Does Not Invalidate Victims' Writs

The district court went further astray in adopting the government's novel claim—raised for the first time on remand from this Court—that, despite TRIA's deliberate grant of priority to terrorism victims, the prior exclusive jurisdiction doctrine bars Victims' writs. JA419-21.

34

### 1. The Prior Exclusive Jurisdiction Doctrine Is Displaced By The Forfeiture Statute

First, it was error for the district court to apply the prior exclusive jurisdiction doctrine in the context of an action under the forfeiture statute. As the district court recognized, the forfeiture statute has a provision that is "admittedly quite similar to that of the prior-exclusive-jurisdiction doctrine." JA422. But the district court failed to perceive the import of this "similar[ity]": The forfeiture statute's exclusive jurisdiction provision necessarily displaces the common law doctrine of prior exclusive jurisdiction.

The Supreme Court has "always recognized that federal common law is 'subject to the paramount authority of Congress.'" *City of Milwaukee v. Illinois*, 451 U.S. 304, 313 (1981) (citation omitted). Notably, "Congress need not 'affirmatively proscribe' the common law doctrine at issue" in order to override it. *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 10 (1st Cir. 2005) (quoting *United States v. Texas*, 507 U.S. 529, 534 (1993)). And "[l]egislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law." *AEP*, 564 U.S. at 423 (citation omitted; second

35

alteration in original). "The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute 'speak[s] directly to [the] question' at issue." *Id.* at 424 (citation omitted; alterations in original).

The prior exclusive jurisdiction doctrine is a "prudential" doctrine of federal common law that exists to choose between two otherwise valid assertions of jurisdiction. *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142, 1145 (9th Cir. 1989). Where there is an applicable statute establishing jurisdictional primacy, the doctrine is necessarily displaced. Here, the forfeiture statute speaks directly to the jurisdictional issue—it provides that property "detained" in a forfeiture action "shall be … subject only to the orders and decrees of the court or the official having jurisdiction thereof." 18 U.S.C. § 981(c). Thus, in a forfeiture case, the prior exclusive jurisdiction doctrine has no purchase. Normally, a court simply would apply Section 981(c) to resolve any issues of competing jurisdiction over property that is the subject of a forfeiture action without ever considering the prior exclusive jurisdiction doctrine. *See, e.g.*, *Wada v. U.S. Secret Serv.*, 525 F. Supp. 2d 1, 11-12 (D.D.C. 2007) (court lacked jurisdiction over funds under Section 981(c) because the "United States

36

District Court for the Eastern District of Michigan [had already] issued the warrant to seize the funds" in a forfeiture action).[10]

Assuming the Funds were validly arrested in the forfeiture action, *see infra* pp. 59-60, the same is necessarily true here—by providing for exclusive jurisdiction over funds "detained" in forfeiture, Section 981(c) displaces the prior exclusive jurisdiction common law doctrine. *See AEP*, 564 U.S. at 424; *cf. Arizona v. California*, 373 U.S. 546, 565-66 (1963) (doctrine of equitable apportionment was subordinate to federal statute prescribing method for allocation of interstate water rights); *Thomas v. Contoocook Valley Sch. Dist.*, 150 F.3d 31, 39 n.5 (1st Cir. 1998) ("Supreme Court has explicitly held that Congress intended to displace federal common-law rules of preclusion in actions brought pursuant to Title VII and the ADEA").

---

[10] Notably, the United States itself has made a similar argument in the context of efforts to apply the prior exclusive jurisdiction doctrine to actions under the civil forfeiture statute. *See United States v. PetroSaudi Oil Services (Venezuela) Ltd.*, 70 F.4th 1199, 1209 (9th Cir. 2023) (government arguing that the jurisdictional provision applicable in that action, 28 U.S.C. § 1355(b)(2), "displace[d] the [prior exclusive] doctrine by expressly authorizing U.S. courts to exercise jurisdiction over property that has been seized by a foreign government").

37

## 2. TRIA's Notwithstanding Clause Overrides The Forfeiture Statute

TRIA supercharges terrorism victims' ability to enforce judgments against blocked assets of state sponsors of terrorism. It does that in significant part through its authorization of attachment "[n]otwithstanding any other provision of law," TRIA, § 201(a), which "signals that the TRIA prevails over conflicting provisions of law," *Greenbaum*, 67 F.4th at 433.

The ordinary meaning of "'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'" *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 301 (2017) (quoting *Webster's Third New International Dictionary* 1545 (1986)). In statutes, the word ['notwithstanding'] 'shows which provision prevails in the event of a clash.'" *Id.* (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 126-27 (2012)). And the phrase "[n]otwithstanding *any other provision of law*" is especially "broad." *Crowley Caribbean Transp., Inc. v. United States*, 865 F.2d 1281, 1283 (D.C. Cir. 1989) (emphasis added; alteration in original). "[A] clearer statement is difficult to imagine." *Id.* (citation omitted). Accordingly, this Court has held that "[t]he phrase

38

clearly requires courts to disregard other statutory provisions that conflict with the scope of the TRIA." *Greenbaum*, 67 F.4th at 432.

Both the district court and the government below implicitly recognized that TRIA's "notwithstanding" clause overrides the government's forfeiture action, including the exclusive jurisdiction provision of Section 981(c), by positing that Section 981(c) barred Victims' writs under the FSIA but not under TRIA. JA422 ("Because the FSIA, unlike TRIA, has no 'notwithstanding' clause, [Section 981(c)] would preclude Plaintiffs from relying on the FSIA to attach the Wells Fargo funds."); *see also* U.S. Reply Br. 18-19, *Est. of Levin*, No. 21-cv-420 (D.D.C. Mar. 10, 2023), ECF No. 33. Indeed, as between Victims' writs under TRIA and the government's forfeiture action, there can be no question— TRIA overcomes the exclusive jurisdiction provision of Section 981(c). *Greenbaum*, 67 F.4th at 432.

### 3. TRIA Further Overrides Any Application Of The Prior Exclusive Jurisdiction Doctrine

It would be highly unusual to conclude that even though Section 981(c) displaces the prior exclusive jurisdiction doctrine, and Section 981(c) is itself overridden by TRIA's "notwithstanding" clause, the prior exclusive jurisdiction doctrine can be resurrected to bar Victims' writs

39

and is not itself overcome by TRIA. But that is essentially what the district court determined. *See* JA419, 421-22. In light of Congress's clear displacement of the prior exclusive jurisdiction doctrine in the forfeiture statute, and its express pronouncement that TRIA overrides other legal provisions, the district court's pivot to the prior exclusive jurisdiction doctrine contravenes the text and purpose of these statutes.

Congress enacted TRIA to address the "'practical and legal difficulties'" that "plaintiffs" who have obtained "a judgment … under the terrorism exception … 'often faced' … at the enforcement stage." *Bank Markazi*, 587 U.S. at 216-17 (quoting *Amicus* Brief for United States). Accordingly, the "clear design" of the "notwithstanding any other provision of law" clause "was to enable the victims of terrorism to execute on the assets of a state found to have sponsored or assisted in a terrorist act." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 391-92 (2009) (Kennedy, J., concurring in part and dissenting in part). In other words, "[t]he effect of" TRIA's "notwithstanding" clause "is to ensure that other laws do not bar victims' efforts to enforce judgments against terrorist states." *Id.*

40

In light of TRIA's expansive scope, the "[n]otwithstanding" clause's invalidation of conflicting "provision[s] of law," TRIA § 201(a), applies with full force to common-law rules like the prior exclusive jurisdiction doctrine. In *Greenbaum*, the Court concluded that TRIA does not preclude federal sovereign immunity, which is rooted in constitutional principles, but reserved the question of whether TRIA's "notwithstanding any other provision of law" clause applied to "federal or state 'common law doctrines.'" 67 F.4th at 433. It should answer that question affirmatively now. The district court cited *Greenbaum* to support its holding that TRIA's "notwithstanding" clause applies only to statutory enactments, *see* JA417-19, but *Greenbaum* itself strongly suggests that TRIA would override the common law. In *Greenbaum*, the Court explained that, unlike sovereign immunity, "displacing federal common law does not take much clarity" and further observed that the "phrase 'provision of law' may in some contexts be best read to displace other forms of law, such as a common law doctrine." 67 F.4th at 432-34.

Indeed, this Court has long recognized that the phrase "provision of law" can refer to both statutes and common-law doctrines. In *King v. Dole*, the Court held that a "notwithstanding any other provision of law"

41

clause in a statute of limitations precluded a litigant from invoking the common-law doctrine of equitable enlargement. 782 F.2d 274, 275-76 (D.C. Cir. 1986) (per curiam). The Court explained that the statute's "clear and emphatic" preclusion of "any other provision of law" "left no doubt as to the mandatory nature of the time limit," dooming any reliance on a common-law rule. *Id.* at 276. Similarly, in *District of Columbia v. Brady*, the Court held that a D.C. Code provision creating an administrative remedy to recover taxes but preserving a taxpayer's right to seek "any remedy which he might have under any other provision of law" meant that he was still "permitted recourse to … a common-law suit for recovery." 288 F.2d 108, 110 (D.C. Cir. 1960) (en banc); *cf. Exxon Shipping Co. v. Baker*, 554 U.S. 471, 488-89 (2008) (construing "any provision of law for damages" in the Clean Water Act to encompass "common law punitive-damages remedies"). *King* and *Brady* should be dispositive here.[11]

---

[11] *See also Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 958 (9th Cir. 2016) (citing TRIA's "notwithstanding" clause to support displacement of federal common-law presumption of separateness between a foreign state and its instrumentalities), *abrogated on other grounds by Rubin*, 138 S. Ct. 816; *Savage Servs. Corp. v. United States*, 25 F.4th 925, 938-43 (11th Cir. 2022) ("[n]otwithstanding any other

While the district court looked to dictionary definitions suggesting that "provision" typically means a "clause in a statute, contract, or other legal instrument," JA418 (quoting *Greenbaum*, 67 F.4th at 432), other definitions of "provision," such as "something provided," *American Heritage Dictionary* 1412 (4th ed. 2000), "the act or process of providing" (as in "the [provision] of free speech"), *Webster's Third New International Dictionary* 1827 (2021), or "[a] stipulation made beforehand," *Black's Law Dictionary* 1240 (7th ed. 1999), are sufficiently broad to include the common law.

Moreover, the district court failed to consider the definition of "law," which modifies "provision" and thus qualifies its meaning in TRIA. *Black's Law Dictionary* (7th ed.) defines "law" as "[t]he aggregate of legislation, judicial precedents, and accepted legal principles." *Id.* at

---

provision or rule of law" clause in the Oil Pollution Act displaced common law causes of action); *Brown v. United Airlines, Inc.*, 720 F.3d 60, 66-67 (1st Cir. 2013) (rejecting argument that "the plain meaning of the word 'provision' does not encompass common law" as "simply wrong"); *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 607 (7th Cir. 2000) ("[s]tate common law counts as an 'other provision having the force and effect of law'"); *Shamrock Farms Co. v. Veneman*, 146 F.3d 1177, 1180 (9th Cir. 1998) ("by using the expression 'any other provision of law'" in statute disclaiming federal preemption, Congress "demonstrated its intent to encompass all law, whether it be statutory law, common law, or constitutional law").

1015; *see also Shamrock Farms*, 146 F.3d at 1181 ("a general reference to any or all 'law' connotes a … broa[d] concept"). Certainly, that definition encompasses the common law.

Nor did the district court grapple with other evidence of ordinary legal usage. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 9 (2011) (reviewing judicial usage of "file" to aid in statutory construction). Courts regularly refer to "common law provisions," often alongside statutory provisions, when discussing rules found in the common law. *See, e.g.*, *Brown*, 720 F.3d at 67 (collecting cases); *Rios v. Nicholson*, 490 F.3d 928, 931 (Fed. Cir. 2007) ("mailbox rule" is "common law provision"); *Resol. Tr. Corp. v. Miramon*, 22 F.3d 1357, 1360 (5th Cir. 1994) (discussing abrogation of "federal common law provision" of negligence standard of care by statute); *Caspary v. La. Land & Expl. Co.*, 707 F.2d 785, 792 (4th Cir. 1983) (discussing statutory replacement of "common law provision" involving right to inspect corporate records).[12]

---

[12] *See also Montville Twp. v. Woodmont Builders, LLC*, 244 F. App'x 514, 515 (3d Cir. 2007) (referring to "common law provisions"); *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996) (same); *Greenblatt v. Drexel Burnham Lambert, Inc.*, 763 F.2d 1352, 1359 (11th Cir. 1985) (same); *George v. Com. Credit Corp.*, 440 F.2d 551, 554 (7th Cir. 1971)

Especially in light of this established usage, "[t]he word "provision," though inexact, is elastic enough to encompass common law." *Brown*, 720 F.3d at 67.

TRIA does not upset this settled linguistic convention. Its reference to "provision[s] of law"—particularly in light of the statute's broad aims of boosting terrorism victims' attachments—covers common-law provisions and statutory provisions alike.[13]

> ### 4. In Any Event, The Prior Exclusive Jurisdiction Doctrine Does Not Invalidate Proceedings Pending Before The Same Court

Even if TRIA does not override the prior exclusive jurisdiction doctrine, the doctrine does not invalidate Victims' writs because they were obtained in the same court as the forfeiture action. The district

---

(same); *Phila. & Reading Ry. Co. v. Marland*, 239 F. 1, 15 (3d Cir. 1917) (same).

[13] The district court's fear that allowing TRIA to override the prior exclusive jurisdiction doctrine will result in "numerous and conflicting proceedings" brought by different creditors, JA419, is unfounded. Although the prior exclusive jurisdiction doctrine cannot be used to invalidate a TRIA action in favor of a non-TRIA claim, there is no reason why the black-letter rule that "the first in time is the first in right," and "a prior lien gives a prior claim," cannot facilitate the orderly resolution of multiple TRIA actions—as it does in many other contexts. *United States v. City of New Britain*, 347 U.S. 81, 85 (1954) (citation omitted).

court's contrary conclusion was based on a novel distortion and unprecedented extension of the doctrine.

The prior exclusive jurisdiction governs when two courts "each proceed against the same *res*." *United States v. $79,123.49 in U.S. Cash & Currency*, 830 F.2d 94, 96 (7th Cir. 1987). In this situation, "the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other *courts*." *Colo. River Water Conservation Dist.*, 424 U.S. at 818 (emphasis added); *see also Penn Gen. Cas. Co. v. Pennsylvania ex rel. Schnader*, 294 U.S. 189, 195 (1935) ("the principle … is established that the court first assuming jurisdiction over the property may maintain and exercise that jurisdiction to the exclusion of the other"); *accord Wabash R.R. Co. v. Adelbert Coll. of W. Rsrv. Univ.*, 208 U.S. 38, 54 (1908) ("When a court of competent jurisdiction has, by appropriate proceedings, taken property into its possession … the property is thereby withdrawn from the jurisdiction of all other courts.").

This rule—that only one court at a time can exercise jurisdiction over a *res*—staves off the risk of dueling, inconsistent rulings from multiple courts regarding the disposition of that property. *$79,123.49*, 830 F.2d at 97 ("The logical and practical difficulty of two courts

simultaneously vying for possession or control of the same property is the key"). Instead, additional claimants to the property are supposed to submit their claims before the court that first exercised jurisdiction over the *res*. *See id.* at 99.

The doctrine is most frequently addressed and takes on "especial importance" when the two tribunals are a state court and a federal court. *Wabash R.R. Co.*, 208 U.S. at 54. In that context, it prevents "unseemly and disastrous conflicts in the administration of our dual judicial system." *Penn Gen. Cas. Co.*, 294 U.S. at 195. But the doctrine is also based on "considerations of comity" and "prudential policies of avoiding piecemeal litigation," and for that reason it can apply even as between two federal courts. *Chapman v. Deutsche Bank Nat'l Tr. Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011) (per curiam) (citation omitted); *see also United States v. $270,000.00 in U.S. Currency, Plus Int.*, 1 F.3d 1146, 1149 (11th Cir. 1993) (per curiam) (highlighting "the spirit of comity" that the doctrine promotes); 13F Wright & Miller, *Federal Practice and Procedure* § 3631 (3d ed. updated 2022) (explaining that "the rule … predates our dual federal-state court system").

47

The district court here (not Victims) endorsed a "novel" (JA420) extension of the doctrine—that it could apply as between cases filed in the *same* court. According to the district court, "[i]t is the first-filed *suit* that takes precedence, regardless of whether other actions concerning the property are filed in that district or even before the same judge." *Id.* But none of the cases cited by the district court support that proposition—references in those cases to multiple *suits* involved suits pending in different courts. *See United States v. Bank of N.Y. & Tr. Co.*, 296 U.S. 463, 478 (1936) (applying prior exclusive jurisdiction doctrine to allow suit in state court to proceed over suit in federal court); *Hammer v. U.S. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 536 (7th Cir. 2018) (discussing prior exclusive jurisdiction in context of related federal and state court suits). And the district court did not cite a *single* case from the doctrine's long historical pedigree employing it to terminate another suit filed in the same court.

None of the purposes animating the doctrine would be vindicated by extending it to two suits over the same property brought in the same forum. The "harmonious cooperation of federal and state tribunals" is obviously not at stake. *Princess Lida of Thurn & Taxis v. Thompson*, 305

48

U.S. 456, 466 (1939). Rather, "where two suits are in the same court, the purposes for which the prior exclusive jurisdiction [doctrine] developed, namely the interests of comity and protection against piecemeal litigation, cease to be an issue." *MidCap Funding XLII Tr. v. Birch Hill Real Est., LLC*, 2019 WL 3281280, at \*5 (E.D. Wis. July 19, 2019). And the principle that judges should try to avoid "stepping on each other's toes when parallel suits are pending in different courts" is irrelevant when "only one court (though more than one judge) is hosting the parallel suits." *Smentek v. Dart*, 683 F.3d 373, 376 (7th Cir. 2012).

The district court expressed concerns about "different judges in the same courthouse" rendering "competing rulings," JA421, but courts have many tools at their disposal to address such concerns—including requiring litigants to identify related cases, assigning related cases to the same judge, and reassignment mechanisms, *e.g.*, D.D.C. Loc. Civ. R. 40.5(b)-(c). The government utilized precisely those tools here when it successfully moved to have all of the cases regarding the Funds reassigned to Judge Boasberg. *See* JA161-74.

Relying on prior exclusive jurisdiction is especially absurd now that all the cases involving the Funds in the district court have been placed

49

before the same judge.  *See Espat v. Espat*, 56 F. Supp. 2d 1377, 1381 (M.D. Fla. 1999) (where two actions involving the same property came before different judges of the same court, "the transfer of [one of the cases] to [the judge hearing the other case] and the consolidation of the two cases renders [a party's prior exclusive jurisdiction] argument moot"); JA219-21; JA172-74; *see also* Claim by Crystal Holdings, Forfeiture Action (Dec. 7, 2022), ECF No. 17.  The district court can readily resolve all the issues raised by the parties and determine the fate of the Funds without risking inconsistent rulings or intra-court tension.

Extending the prior exclusive doctrine to suits pending in the same court, as the district court did, would transform the doctrine from a rule of comity into a rule of priority.  Under the district court's approach when multiple litigants make claims to the same *res* before the same court, the first-in-time suit will always take precedence, regardless of the strength of the respective suits.  In other words, the district court's reasoning would transform a doctrine about *jurisdiction* as between *two* courts into a rule about the *merits* of individual cases before *one* court.  But no case has treated the doctrine as a rule about the merits—*i.e.*, dictating which of two competing claims before the same court ultimately should

50

prevail—and it would be absurd for the doctrine to do so. Properly understood, the doctrine simply addresses which court has jurisdiction to adjudicate those claims. *See Penn Gen. Cas. Co.*, 294 U.S. at 195-96.

Even as between two courts, the doctrine only operates "so far as its exercise is necessary for the appropriate control and disposition of the property," and it "does not extend beyond the purpose for which it is allowed"—namely, "to enable the court to exercise it appropriately and to avoid unseemly conflicts." *Penn Gen. Cas. Co.*, 294 U.S. at 198. Here, there is no risk of conflicting orders with regard to all the actions filed in the district court.[14] Indeed, the government has effectively conceded as much: the government argued that its motion to reassign Victims' writs to the judge hearing the forfeiture action was required by the rule that "*in rem* matters (such as the Forfeiture Action and the Nautic

---

[14] Other actions against the Funds are presently pending in federal courts in South Dakota and New York, brought by the Levins following the initiation of the forfeiture action and the issuance of Victims' writs. To the extent the Court concludes that TRIA's "notwithstanding" clause does not preclude the prior exclusive jurisdiction doctrine, *see infra* Section I.B.3, the Owens Victims do not dispute that the doctrine would operate to bar other creditors from maintaining later-filed actions against the funds in *other* forums. Those actions present the risk of conflicting judgments that is absent here.

Proceedings) must be heard by a *single court* to avoid inconsistent judgments and proceedings." JA169 (emphasis added). The district court gave that concern credence in granting the government's request, reasoning that "the interests served by the [primary exclusive jurisdiction] doctrine" favored eliminating the risk of "competing judgments" through "formal coordination of all Funds-related proceedings" before a single judge. *Owens*, 2021 WL 131446, at *5. Since the government sought transfer and reassignment on the grounds that it was necessary to head off a jurisdictional issue, it should not be heard to complain now that its request has been granted.

In sum, there is no basis in caselaw or logic to extend the prior exclusive jurisdiction doctrine to dictate priority among two suits pending before the same judge in the same court.

## II. The FSIA Entitles The Owens Victims To Attach And Execute Upon The Iranian Funds

The FSIA is an additional, independently sufficient basis for Victims' writs of attachment. The statute provides that "[t]he property in the United States of a foreign state, … used for a commercial activity in the United States, shall not be immune from attachment in aid of execution … upon a judgment [that] … relates to a claim for which the

foreign state is not immune under section 1605A," "regardless of whether the property is or was involved with the act upon which the claim is based." 28 U.S.C. § 1610(a)(7).

Victims meet each of these requirements for attachment. It is undisputed that they hold a valid judgment against Iran under Section 1605A, and that the Funds are located in the United States. As to Iran's ownership of the Funds, this Court previously held, as a matter of federal common law, that the Funds are the blocked assets "of" Iran under TRIA. *Est. of Levin*, 45 F.4th at 423-24. Although the Court did not reach the question of whether the Funds were also attachable under the FSIA, *id.* at 423 n.19, this Court has long interpreted TRIA and the FSIA in parallel for purposes of assessing foreign sovereign ownership, *see Heiser*, 735 F.3d at 937-39 (explaining that the ownership requirement in both statutes turned on the meaning of the word "of," and jointly assessing whether certain blocked funds were property "of" a foreign state for purposes of TRIA and the FSIA). Finally, the Funds were arrested in the midst of a quintessentially commercial transaction—Iran's attempted purchase of the *Nautic*. The FSIA therefore entitles Victims to attach the Funds in aid of execution upon their judgments against Iran.

The district court held that the FSIA's commercial activity requirement, the prior exclusive jurisdiction doctrine, and the federal civil forfeiture statute all preclude attachment. Each of these conclusions is misguided and should be reversed.

## A.    The Funds Were Used For A Commercial Activity In The United States

First, the district court erred by concluding that the Funds do not satisfy the FSIA's commercial activity requirement. Section 1610(a)(7) of the FSIA authorizes attachment of "property in the United States of a foreign state" that is "used for a commercial activity in the United States." A "foreign state engages in commercial activity" whenever "it acts 'in the manner of a private player within' the market." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-15 (1992) (finding that "a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods")). Under the FSIA, "commercial activity" is "either a regular course of commercial conduct *or a particular commercial transaction or act*." 28 U.S.C. § 1603(d) (emphasis added).

54

Here, the Funds were undisputedly wired through a bank in the United States for "a particular commercial transaction": the purchase of the *Nautic*. This "contract to buy" goods is quintessential commercial activity. *Weltover*, 504 U.S. at 614. Iran acted as a "private player within [the market]" when it entered into contracts to buy the *Nautic* and wired money through the United States, *id.*, as the district court acknowledged in its original order authorizing Victims' writs, JA77 ("[T]he Court finds that the Iranian funds … were used for commercial activity in the United States because the funds were transmitted through the United States to purchase a petroleum tanker.").

Despite this straightforward evidence of commerciality, the district court below found it dispositive that, at the moment "Plaintiffs sought their writs in May 2020, … the funds had lain dormant for many months." JA426. But this misunderstands the scope of the commerciality inquiry, which requires courts to consider "the totality of the circumstances," including both "facts at the time of filing" and "past uses of the property." *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 785-86 (D.C. Cir. 2020). Courts must examine "the broader context of the property" in order "to accurately characterize what kind of property is at issue" and

55

what transaction "the property was used *for*." *Id.* at 786-87. The answer here is straightforward: the property at issue is cash, and the cash was used to purchase the *Nautic*. That the Funds were arrested by OFAC mid-transaction does not change their inherently commercial "context." *Id.*

Although the district court acknowledged that "past uses of the property" are relevant to commerciality, its analysis was wholly focused on the Funds' status "[a]t the time that Plaintiffs filed" for attachment. JA426. But as this Court made clear in *TIG*, that "courts should assess [commerciality] at the time of filing does not" limit the temporal scope of that assessment; on the contrary, the "facts [that] bear on" commerciality must include "all uses of the [p]roperty, including recent past uses, as well as whether the foreign state has manipulated the [p]roperty's use or status to evade attachment and execution." 967 F.3d at 785. Blocking a transaction for the commercial sale of a ship does not eliminate the commercial nature of the transaction, just as seizing a piece of commercial property does not eliminate the commercial nature of the real estate. The court failed to meaningfully consider Iran's "recent past us[e]" of the Funds for its illicit purchase of the *Nautic*—not to mention

56

its "manipulat[ion]" of the funds through an Omani shell corporation to evade attachment—and thus failed to carry out the "totality of the circumstances" inquiry that *TIG* requires. *Id.*

The district court punctuated its brief commerciality analysis with a passing reference to *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16 (D.D.C. 1999). In *Flatow*, the court concluded that blocked accounts, containing Iranian diplomatic funds originally intended to cover "maintenance and repair expenses relating to" Iran's shuttered U.S. embassy, were "decidedly sovereign," rather than commercial, "in nature." *Id.* at 23-24. But *Flatow* is easily distinguished here: Iran used the Funds for a wholly commercial purpose, not a diplomatic one. The "particular actions that [Iran] perform[ed]" "are the *type* of actions by which a private party engages in 'trade and traffic or commerce,'" and thus "are 'commercial' within the meaning of the FSIA." *Weltover*, 504 U.S. at 614 (citation omitted).

Under the district court's approach, blocked property could never satisfy Section 1610(a)(7)'s commerciality requirement, because its "commercial purpose" is always "thwarted at the threshold." JA426. But that is the very purpose of blocking. Given Congress's clear desire to

afford victims of terrorism recovery, the Court should reject such limitation.

### B.    The Prior Exclusive Jurisdiction Doctrine Does Not Apply

Separately, the district court held—without analysis—that the prior exclusive jurisdiction doctrine "applies with equal force to Plaintiffs' FSIA claims." JA421. That is mistaken, for reasons already discussed in Part I.B.4. The prior exclusive jurisdiction doctrine is supposed to ensure that claims to the same property are adjudicated in one forum, and here all claimants to the Funds had suits pending *in the same court and before the same judge*. Even where it properly applies, the doctrine does not operate to invalidate a later-filed claim before the same court.

### C.    The Government's Forfeiture Action Does Not Bar Attachment Here

Finally, the district court was mistaken to hold that the government's forfeiture complaint under 18 U.S.C. § 981 precludes attachment under the FSIA. As discussed, and as the district court recognized, the "operation" of Section 981(c) is "quite similar to that of the prior exclusive jurisdiction doctrine." JA422. Section 981(c) provides that "[p]roperty taken or detained" under its authority is "deemed to be

in the custody of the Attorney General" and "subject only to the orders and decrees *of the court or the official having jurisdiction thereof*." (Emphasis added).

But, as discussed, Victims sought writs in the same court—the District Court for the District of Columbia—as the forfeiture action, and their claims have in fact been transferred to the same judge presiding over the forfeiture action. JA172-74. As a result, the Funds were "subject only to the orders and decrees of the court … having jurisdiction" in the forfeiture action. 18 U.S.C. § 981(c). Although the district court contended that other district courts have dismissed suits in similar instances, *see* JA422-23, it provided no textual explanation for why Victims' suits would violate the forfeiture statute—given its jurisdiction over both the forfeiture action and Victims' writs. In actuality, the civil forfeiture statute, like the prior exclusive jurisdiction doctrine, poses no barrier to attachment in these circumstances.

Moreover, by the statute's terms, "a valid seizure of the res is a prerequisite to the *initiation* of an *in rem* civil forfeiture proceeding." *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 84 (1992) (emphasis in original). Here, the Funds have not been "taken or

59

detained" under 18 U.S.C. § 981(c) because they remain in the possession, custody, and control of Wells Fargo. *See Black's Law Dictionary* (11th ed. 2019) 1754 ("Take" is "[t]o obtain possession or control."); *id.* at 564 ("Detention" is "[t]he withholding of another's personal property."); Fed. R. Civ. P. Supp. R. G(3)(c)(ii)(A). Although the district court thought that the Funds "were within the exclusive control" of the government because of the blocking order, the reality is that Wells Fargo continues to hold the Funds and thus controls them, JA424; and ultimately, it is Wells Fargo's choice (albeit one with legal consequences) whether to comply with the blocking order.[15]  Accordingly, Section 981 does not preclude Victims' attachment actions because there has been no "valid seizure of the res." *Republic Nat'l Bank*, 506 U.S. at 84.[16]

---

[15]  Moreover, the district court made no attempt whatsoever to reconcile this rationale—that the Funds are controlled by the government because of the blocking order—with its earlier conclusion that the Funds have become "unblocked" by the forfeiture action.  JA413-14.

[16]  The district court faulted Victims for raising this point as a "collateral challenge" in the writ proceedings, rather than in the forfeiture action, JA423, but the forfeiture action has been stayed pending the writ proceedings, JA220, and, if and when it goes forward, Victims plan to amend their answer to challenge the forfeiture action on this basis.

### III.   TRIA And The FSIA Have Not Been Repealed *Sub Silentio*

Despite the sweeping text and clear purpose and history of TRIA and the FSIA, the district court claimed that allowing Victims to proceed against terrorist assets would "fundamentally undermine Congress's intended scheme for compensating victims."  JA427.  The court pointed to subsequently enacted routes for recovery, primarily the Victims Fund, to conclude that Congress "modified and refashioned its approach to affording these victims pathways" of relief.  *Id.*

The notion that Congress *sub silentio* watered down TRIA (with its "notwithstanding" clause) and the FSIA—or wiped them out altogether by enacting *further* avenues of recovery to make relief *more* attainable for victims of terrorism—is unfounded.  *See Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015) ("Implied repeals are disfavored and  not presumed unless the legislative intent is 'clear and manifest'" (citation omitted)).  To the contrary, Congress's extensive efforts in this space have been motivated by the "barriers that have made it nearly impossible" for victims of terrorism "to execute civil judgments against … state sponsors of terrorism."  *Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d at 62.

Moreover, the Victims Fund, while a helpful resource, is no substitute for individual enforcement of judgments under TRIA and the FSIA. While it is true that civil forfeiture actions by the government against state sponsors of terrorism can generate awards that help support the Victims Fund, the government gets to keep 25% of qualifying funds for itself. 34 U.S.C. § 20144(e)(2)(A). And any recovery victims of terrorism would obtain from the remaining 75% of proceeds (assuming the government chooses to place them in the Victims Fund) would be miniscule, because of the Fund's staggering ratio of claimants to dollars.

Since Congress authorized suits against state sponsors of terrorism, courts have awarded more than one hundred billion dollars in judgments against those states—but the Victims Fund has only disbursed approximately $3.3 billion to victims since 2017. Jennifer K. Elsea, Cong. Rsch. Serv., IF10341, *Justice for United States Victims of State Sponsored Terrorism Act: Eligibility and Funding* 1-2 (2023); U.S. Victims of State Sponsored Terrorism Fund, http://www.usvsst.com (last updated Nov. 14, 2023). The Fund had $107.8 billion in outstanding claims in 2023, and that number "will likely increase as courts continue to award judgments." Elsea, *supra*, at 2. At the moment, it is unclear

62

whether or when the Victims Fund will have sufficient funds to make further payments, which must be divided among claimants. *See* U.S. Victims of State Sponsored Terrorism Fund, *supra*. Certainly, it is hard to imagine that the Fund will ever disburse more than a small fraction of the damages Victims are entitled to recover.

Notably, 50% of Victims Fund disbursements must go to "9/11 related victims," while the rest is divided up pro rata among the other claimants, like Victims. 34 U.S.C. § 20144(d)(3)(A)(i). And recoveries are capped at 30% of a claimant's compensatory damages judgment (excluding any interest or punitive damages), at least until every other similarly situated beneficiary has received that same percentage. *Id.* § 20144(d)(3)(B), (j)(3). These limitations further increase the likelihood that Victims—and many others like them—will "only recover a percentage of their ultimate awards." *Fraenkel v. Islamic Republic of Iran*, 326 F.R.D. 341, 345 (D.D.C. 2018).

The Victims Fund has been impactful in supporting terrorism victims who are unable to find and attach upon foreign states' assets, but it is hardly a comprehensive remedial scheme and cannot replace attachment and execution under TRIA and the FSIA. And there is zero

reason to think that Congress intended to restrict the robust relief available under TRIA and the FSIA when it created a limited alternative channel that serves the same purpose: easing the way to recovery for victims of state-sponsored terrorism. "Congress's intent," JA427, is best furthered by giving full effect to *each* of the statutes it enacted—including TRIA and the FSIA—to help victims in their often decades-long fights for justice.

## CONCLUSION

The Court should reverse the judgment of the district court and remand with instructions to deny the government's Renewed Motion to Quash and proceed to consideration of the Owens Appellants' Motion for Condemnation and Recovery.

Dated:  December 15, 2023       Respectfully submitted,

/s/ *Matthew D. McGill*
Matthew D. McGill
Jessica L. Wagner
Samuel C. Speers
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone: 202.955.8500
Facsimile: 202.530.9522
mmcgill@gibsondunn.com

*Counsel for Owens Appellants*

64

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,954 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

Dated:  December 15, 2023

/s/ *Matthew D. McGill*
Matthew D. McGill
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
Telephone: 202.955.8500
mmcgill@gibsondunn.com

*Counsel for Owens Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2023, I electronically filed the foregoing document with the Clerk of Court for the United States Court of Appeals for the D.C. Circuit and accomplished service by using the appellate CM/ECF system.

Dated: December 15, 2023                    /s/ *Matthew D. McGill*
                                            Matthew D. McGill