UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Appeal No. 23-7080
(Consolidated with Appeal No. 23-7082)
(Civ. A. Nos. 21-0420 (lead), 21-0126, 21-0127, 21-0128, 05-2494)

ESTATE OF JEREMY ISADORE LEVIN, et al.,          Appellants,

JAMES OWENS, et al.,          Appellants,

v.

WELLS FARGO BANK, N.A.,

- and -

UNITED STATES OF AMERICA,          Appellees.

_____

# BRIEF FOR APPELLEE UNITED STATES

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MATTHEW M. GRAVES
United States Attorney

BRIAN P. HUDAK
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-2549

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

<u>Parties and Amicus</u>

The parties to these consolidated appeals are set forth below.  Each matter concerns $9,998,941.91 (the "Funds") being held at Wells Fargo Bank, N.A. ("Wells Fargo"), which are proceeds of the sale of a petroleum tanker called the *Nautic* or the *Gulf Sky*.

The Appellants are (A) the Estates of Jeremey Isadore Levin and Lucille Hare Levin, and Suzelle M. Smith as executrix of the Levin Estates (the "Levin Creditors"), and (B) James Owens, Judith Abasi Mwila, and Rizwan Khaliq and numerous other individuals listed as petitioners in District Court Civ. A. No. 21-0126 (the "Owens Creditors"), who were petitioners for collection writs below.  The Appellees are Wells Fargo, the respondent below, and the United States, intervenor below.

Presently, Crystal Holdings Limited ("Crystal Holdings"), the beneficiary of the interrupted funds transfer at issue, has filed an amicus brief in support of neither party after being denied leave to intervene in this appeal.

<u>Rulings Under Review</u>

It is the United States' understanding that at issue in these consolidated appeals are the June 1, 2023, Memorandum Opinion (R.36, Civ. A. No. 21-0420, JA404–28) and Order (R.35, Civ. A. No. 21-0420, JA403), which quashed the Levin

and Owens Creditors' collection writs upon remand to the District Court following this Court's opinion in *Estate of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416, 424 (D.C. Cir. 2022). The District Court's decision on remand is also available at *Estate of Levin v. Wells Fargo Bank, N.A.*, Civ. A. No. 21-0420 (JEB), 2023 WL 3750577 (D.D.C. June 1, 2023).

<u>Related Cases</u>

There are no pending related appeals. This matter was previously before the Court in *Estate of Levin v. Wells Fargo Bank, N.A.*, No. 21-7036 (consolidated with 21-7041, 21-7044, 21-7052, 21-7053) (D.C. Cir.), which resulted in the Court's prior opinion cited above.

Further, the following actions, which remain pending in various district courts, are related to these consolidated appeals.

A.    *United States v. $2,340,000.00 Associated With Petroleum Tanker Nautic*, Civ. A. No. 20-1139 (JEB) (D.D.C. filed May 1, 2020) (the "Forfeiture Action"), where the United States has sought to forfeit the Funds and in which the Owens Creditors and Crystal Holdings have filed claims.

B.    *Levin v. Bank of New York*, Civ. A. No. 09-5900 (S.D.N.Y.), where the Levin Creditors obtained and served a separate writ of attachment on Wells Fargo directed at the Funds. *Id.*, R.1309. The United States intervened in that action, and

the parties entered into a stipulation that absolved Wells Fargo from turning over the Funds in response to that writ absent further order of the court. *Id.*, R.1338.

C.     *Levin* v. *Islamic Republic of Iran*, Misc. No. 20-0035 (D.S.D. filed Dec. 29, 2020) ("South Dakota Writ Action"), where the Levin Creditors obtained and served a separate writ of attachment on Wells Fargo directed at the Funds. *Id.*, R.3. The United States intervened in that action, and the parties successfully moved to stay that action pending the outcome of these proceedings. *Id.*, R.25.

D.     *Levin v. Wells Fargo Bank, N.A.*, Civ. A. No. 21-4024 (D.S.D. filed Feb. 12, 2021), where the Levin Creditors seek to compel Wells Fargo to turnover the Funds to them based on the writ obtained in the South Dakota Writ Action. *Id.*, R.1. The United States intervened in that action, and the parties successfully moved to stay that action pending the outcome of these proceedings. *Id.*, R.28.

## <u>TABLE OF CONTENTS</u>

<u>**Heading**</u>                                                                                                          <u>**Page**</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF CONTENTS........................................................................ iv

TABLE OF AUTHORITIES .................................................................. vi

GLOSSARY........................................................................................ xii

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .........................................................2

STATUTES AND REGULATIONS.........................................................2

STATEMENT OF ISSUES ....................................................................2

COUNTERSTATEMENT OF THE CASE................................................3

I.      Statutory Background .....................................................................3

        A.      U.S. Sanctions Prohibit Using the U.S. Financial System to Support
                Illicit Business With Iran and Terrorist Organizations. ........................3

        B.      Congress Enacted the Victims Act After FSIA and TRIA to Establish
                an Orderly Process for Distributing Forfeitable Assets. ......................4

II.     Wells Fargo Blocked the Transfer of the Funds.............................................7

III.    The United States Filed its Forfeiture Complaint and Arrested the Funds. ....8

IV.     Creditors Obtained the Writs, Which the District Court Initially Quashed. ...9

        A.      Appellants Owens Creditors' Writs and Related Proceedings. ............9

        B.      Appellants Levin Creditors' Writ and Related Proceedings...............10

V.      This Court Reversed and Remanded for Further Proceedings.....................11

VI.     On Remand, the District Court Again Quashed the Writs for Multiple
        independent Reasons. ...................................................................12

SUMMARY OF THE ARGUMENT ...................................................15

STANDARD OF REVIEW ...................................................................16

ARGUMENT .........................................................................................16

I.      The Writs Cannot Be Sustained Under TRIA. ..............................16

        A.      The United States' OFAC License Un-Froze the Funds....................17

        B.      The Prior Exclusive Jurisdiction Doctrine Prevents In Rem
                Jurisdiction Over the Funds in These Writ Proceedings....................32

II.     FSIA Provides No Basis for the Writs. .........................................46

        A.      The Civil Forfeiture Statute Bars Creditor Process Against Property
                Arrested Under Forfeiture. ...............................................46

        B.      The Funds Were Not Being Used for a Commercial Purpose When
                Creditors Attached Them. ...............................................51

CONCLUSION ......................................................................................54

CERTIFICATE OF COMPLIANCE .....................................................55

CERTIFICATE OF SERVICE ...............................................................55

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)..................................................................................43

*Anderson v. Stephens*,
875 F.2d 76 (4th Cir. 1989) ....................................................................21

\* *Bank of N.Y. v. Rubin*,
484 F.3d 149 (2d Cir. 2007)............................................15, 19, 21, 23

*Bennett v. Islamic Republic of Iran*,
618 F.3d 19 (D.C. Cir. 2010) ..................................................................16

*Cason v. Holder*, 815 F. Supp. 2d 918 (D. Md. 2011),
*aff'd*, 464 F. App'x 131 (4th Cir. 2012)................................................49

*Chicot Cnty. Drainage Dist. v. Baxter State Bank*,
308 U.S. 371 (1940)..................................................................................48

*Clark v. Martinez*,
543 U.S. 371 (2005)........................................................................... 35-36

\* *Colo. River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)......................................................... 13, 15-16, 34

*Dames & Moore v. Regan*,
453 U.S. 654 (1981)..................................................................................20

*Darlak v. Columbus-Am. Discovery Grp., Inc.*,
59 F.3d 20 (4th Cir. 1995) ......................................................................34

*Est. of Levin v. Wells Fargo Bank, N.A.*,
45 F.4th 416 (D.C. Cir. 2022).......................................... i, 1, 7-9, 12, 24

*Est. of Levin v. Wells Fargo Bank, N.A.*,
Civ. A. No. 21-0420 (JEB), 2023 WL 3750577 (D.D.C. June 1, 2023) ...................i

*Farmers' Loan & Tr. Co. v. Lake St. Elevated R. Co.*,
177 U.S. 51 (1900)....................................................................................35

*Fed. Trade Comm'n v. Pukke*,
53 F.4th 80 (4th Cir. 2022) ................................................................21

*Gonzales v. Arrow Fin. Servs., LLC*,
660 F.3d 1055 (9th Cir. 2011) ...........................................................36

\* *Greenbaum v. Islamic Republic of Iran*,
67 F.4th 428 (D.C. Cir. 2023)................................................. 33, 42-43

*Hammer v. Dep't of Health & Hum. Servs.*,
905 F.3d 517 (7th Cir. 2018) .............................................................45

*Harrison v. Republic of Sudan*, 802 F.3d 399 (2d Cir. 2015),
*clarifying op. & denying reh'g*, 828 F.3d 86 (2016) ...........................47

*Heiser v. Islamic Republic of Iran*,
735 F.3d 934 (D.C. Cir. 2013) .......................................................4, 12

*Ibarra v. United States*,
120 F.3d 472 (4th Cir. 1997) .............................................................49

*Levin v. Islamic Republic of Iran*,
523 F. Supp. 3d 14 (D.D.C. 2021) (Boasberg, J) ...........................10, 12

*Ministry of Def. v. Elahi*,
556 U.S. 366 (2009)..........................................................................44

*Mobilfone Service, Inc. v. FCC*,
79 F. App'x 445 (D.C. Cir. 2003).................................................. 37-38

*Noble Prestige Ltd. v. Galle*,
83 F.4th 1366 (11th Cir. 2023) ..................................................... 41-42

*Opati v. Republic of Sudan*,
140 S. Ct. 1601 (2020)......................................................................17

*PacNet Servs., Ltd. v. Dep't of Treasury*,
No. 21-1069, 2022 WL 2561204 (2d Cir. July 8, 2022) ......................47

*Palmer v. Texas*,
212 U.S. 118 (1909)..........................................................................35

\* *Princess Lida of Thurn & Taxis v. Thompson*,
305 U.S. 456 (1939) ................................................................. 13, 15-16, 34

*Propper v. Clark*,
337 U.S. 472 (1949) ...................................................................... 51

*Robinson v. Shell Oil Co.*,
519 U.S. 337 (1997) ...................................................................... 35

*Rubin v. Islamic Republic of Iran*,
583 U.S. 202 (2018) ................................................................... 5, 40

*Sallee v. United States*,
41 Fed. Cl. 509 (1998) .................................................................. 38

*Scarabin v. DEA*,
966 F.2d 989 (5th Cir. 1992) ......................................................... 41

*Smith v. Fed. Reserve Bank of N.Y.*,
346 F.3d 264 (2d Cir. 2003) ...................................................... 31-32

*Stansell v. Revolutionary Armed Forces of Colombia*,
771 F.3d 713 (11th Cir. 2014) ....................................................... 25

*TIG Ins. Co. v. Republic of Argentina*,
967 F.3d 778 (D.C. Cir. 2020) ................................................... 51-53

*United States v. $174,206.00 in U.S. Currency*,
320 F.3d 658 (6th Cir. 2003) ......................................................... 41

*United States v. $79,123.49 in U.S. Cash*,
830 F.2d 94 (7th Cir. 1987) ....................................................... 40-41

*United States v. $99,500 in U.S. Currency*, 339 F. Supp. 3d 690 (N.D. Ohio 2018),
*aff'd*, 795 F. App'x 332 (6th Cir. 2019) ........................................... 41

\* *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
783 F.3d 607 (7th Cir. 2015) ....................................... 13, 17-18, 21-22

*United States v. Bank of N.Y. & Tr. Co.*,
296 U.S. 463 (1936) ...................................................................... 45

*United States v. Daugerdas*,
892 F.3d 545 (2d Cir. 2018) .......................................................................47

*United States v. Fernandez*,
887 F.2d 465 (4th Cir. 1989) ................................................................ 36-37

*United States v. Hernandez*,
911 F.2d 981 (5th Cir. 1990) ............................................................... 49-50

\* *United States v. Holy Land Found. Relief & Dev.*,
722 F.3d 677 (5th Cir. 2013) ..........................................12-13, 21-23, 36

*United States v. PetroSaudi Oil Services (Venezuela) Ltd.*,
70 F.4th 1199 (9th Cir. 2023) ...................................................................42

*United States v. Price*,
914 F.2d 1507 (D.C. Cir. 1990) ...............................................................49

*United States v. Puentes*,
803 F.3d 597 (11th Cir. 2015) ..................................................................36

*United States v. Texas*,
507 U.S. 529 (1993).................................................................................43

*United States v. U.S. Currency $83,310.78*,
851 F.2d 1231 (9th Cir. 1988) ..................................................................49

*United States v. Vazquez-Alvarez*,
760 F.3d 193 (2d Cir. 2014)......................................................................48

*Va. Uranium v. Warren*,
139 S. Ct. 1894 (2019)..............................................................................35

*Weinstein v. Islamic Republic of Iran*,
299 F. Supp. 2d 63 (E.D.N.Y. 2004) .............................................. 19-21, 23

*Zarmach Oil Servs., Inc. v. Dep't of Treasury*,
750 F. Supp. 2d 150 (D.D.C. 2010) ..........................................................50

**Statutes, Regulations, Rules, and Other Authorities**

18 U.S.C. § 981 .................................................................. 13, 15, 28, 40-41, 46-48

21 U.S.C. § 881 ................................................................................. 40-41

28 U.S.C. § 1291 ...................................................................................2

28 U.S.C. § 1330 ...................................................................................2

28 U.S.C. § 1355 ..................................................................................42

28 U.S.C. § 1605A ................................................................................17

28 U.S.C. § 1610 ......................................................... 4-6, 13, 16, 20, 44, 51, 53

28 U.S.C. § 1651 ...................................................................................2

34 U.S.C. § 20144 ......................................................................... viii, 1, 6

44 U.S.C. § 3512 ..................................................................................37

50 U.S.C. § 1701 .......................................................................... vii, 18-19

50 U.S.C. § 1702 ........................................................................ 3, 18-20

50 U.S.C. § 4301 ...................................................................................5

Fairness for 9/11 Families Act, Pub. L. No. 117-328, div. MM,
136 Stat. 4459, 6106–11 (Dec. 29, 2022) ...................................................7

Iran Threat Reduction and Syria Human Rights Act of 2012,
Pub. L. 112-158, 126 Stat. 1214, 1260 (Aug. 10, 2012) .........................................17

Terrorism Risk Insurance Act, Pub. L. No. 107-297,
116 Stat. 2322 (Nov. 26, 2002) ........................... viii, 4-5, 16-18, 20, 25-26, 32-33, 44

United States Victims of State Sponsored Terrorism Fund Clarification Act,
Pub. L. 116-69, § 1701, 133 Stat. 1134, 1140 (Nov. 21, 2019) ...............................7

31 C.F.R. § 535.502 ..............................................................................21

31 C.F.R. § 544.201 ...............................................................................4

31 C.F.R. § 560.203 ...............................................................................3

31 C.F.R. § 560.211 ................................................................4

31 C.F.R. § 560.519 ..............................................................30

31 C.F.R. § 560.557 ..............................................................31

31 C.F.R. § 594.201 ................................................................4

31 C.F.R. § 594.307 .......................................................... 29-30

31 C.F.R. § 594.502 ..............................................................29

31 C.F.R. § 594.518 ..............................................................31

31 C.F.R. § 596.507 ..............................................................31

Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995) ........................3

Determination to Waive Attachment Provisions Relating to Blocked Property of Terrorist-List States, 65 Fed. Reg. 66,483 (Oct. 28, 2000) ........................4

Fed. R. Civ. P. Supp. G ....................................................9, 50

Fed. R. Crim. P. 41 ..............................................................49

Antonin Scalia & Bryan A. Garner,
Reading Law: The Interpretation of Legal Texts (1st ed. 2012) ....................38, 42

Black's Law Dictionary (11th ed. 2019) (definition of "provision") ....................33

Wright & Miller, 13F Fed. Prac. & Proc. Juris. § 3631 (3d ed., Oct. 2020) ..........34

# GLOSSARY

| Term | Definition |
|------|------------|
| Compensation Fund | United States Victims of State Sponsored Terrorism Fund |
| Creditors | Appellants in these consolidated appeals |
| Credit Suisse | Credit Suisse (Switzerland) Ltd. |
| Crystal Holdings | Amicus Crystal Holdings Limited |
| Forfeiture Action | *United States v. $2,340,000.00 Associated With Petroleum Tanker Nautic*, Civ. A. No. 20-1139 (JEB) (D.D.C.) |
| Funds | $9,998,941.91 traceable to proceeds from the sale of a petroleum tanker called the *Nautic* or *Gulf Sky* |
| FSIA | Foreign Sovereign Immunities Act, codified in various ports of Title 28 of the U.S. Code |
| Holman Fenwick | Holman Fenwick Willan LLP |
| IEEPA | International Emergency Economic Powers Act, codified at 50 U.S.C. § 1701 et seq. |
| Levin Creditors | Appellants Estates of Jeremey Isadore Levin and Lucille Hare Levin, and Suzelle M. Smith as executrix of the Levin Estates |
| Lloyds Bank | Lloyds Bank PLC |
| OFAC | Office of Foreign Assets Control |

Owens Creditors ..................................... Appellants James Owens, Judith Abasi Mwila, and Rizwan Khaliq and numerous other individuals listed as petitioners in District Court Civ. A. No. 21-0126

Taif Mining ............................................. Taif Mining Services

Threat Reduction Act .............................. Iran Threat Reduction and Syria Human Rights Act of 2012

TRIA ...................................................... Terrorism Risk Insurance Act, Pub. L. No. 107-297, 116 Stat. 2322 (Nov. 26, 2002) (codified as amended at 28 U.S.C. § 1610 Note)

UCC ........................................................ Uniform Commercial Code

Victims Act ............................................ Justice for U.S. Victims of State Sponsored Terrorism Act, as amended, 34 U.S.C. § 20144

Wells Fargo ............................................ Wells Fargo Bank, N.A.

Writs ...................................................... the writs of attachment obtained by Creditors directed to the Funds that the district court quashed

## INTRODUCTION

This appeal arises from writs of attachment brought by some of Iran's judgment creditors. Creditors here seek to attach approximately $10 million in proceeds from the sale of a petroleum tanker (the "Funds") by amicus Crystal Holdings to Taif Mining, an Iranian front-company. After the Treasury Department's Office of Foreign Assets Control ("OFAC") blocked the Funds under a sanctions program, the United States obtained an OFAC license permitting it to arrest and forfeit the Funds, then pursued that course with an eye to augmenting a government fund for terrorism victims. *See* 34 U.S.C. § 20144 (the "Victims Act").

After the United States arrested the Funds in forfeiture, Creditors commenced a series of proceedings to seek and obtain writs of attachment against the Funds (the "Writs") under the Terrorism Risk Insurance Act ("TRIA") and the Foreign Sovereign Immunities Act ("FSIA") in partial satisfaction of their judgments. The District Court initially quashed the Writs, but this Court reversed, concluding Iran had an attachable property interest in the Funds. *Est. of Levin v. Wells Fargo Bank, N.A.*, 45 F.4th 416, 423 (D.C. Cir. 2022) ("*Levin I*") (also available at JA197–216). In so ruling, the Court expressly did not reach the United States' alternative grounds for quashing the Writs, and thus remanded so the District Court could consider them in the first instance. *Id.* at 424.

On remand, the District Court again agreed with the United States, quashing Creditors' Writs and preventing them from leapfrogging the United States' earlier filed Forfeiture Action. The parties now return to this Court where Creditors seek review of the District Court's second judgment quashing the Writs. This Court should affirm.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over Creditors' underlying claims under 28 U.S.C. § 1330(a) and other sources of law, which served as a basis for these proceedings under the All Writs Act, 28 U.S.C. § 1651. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an Addendum submitted herewith.

## STATEMENT OF ISSUES

In the opinion of the United States, the questions presented are:

1.      Whether, despite OFAC's license, the Funds are still "frozen" under the sanctions program for purposes of the Terrorism Risk Insurance Act?

2.      Whether the prior exclusive jurisdiction doctrine precludes creditors from instituting an in rem collection proceeding against the Funds when the Funds were already subject to in rem jurisdiction in the forfeiture action?

- 2 -

3.      Whether creditors may invoke the Foreign Sovereign Immunities Act to attach the Funds?

## COUNTERSTATEMENT OF THE CASE

## I.      STATUTORY BACKGROUND

### A.      U.S. Sanctions Prohibit Using the U.S. Financial System to Support Illicit Business With Iran and Terrorist Organizations.

The International Emergency Economic Powers Act ("IEEPA") gives the President certain powers to deal with threats the President has declared to be national emergencies. *See* 50 U.S.C. § 1702. Under these powers, Presidents have issued various Executive Orders declaring the actions and policies of Iran to constitute such threats and directing the Secretary of the Treasury to promulgate rules and regulations to implement their restrictions. *See, e.g.,* Exec. Order 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995). The Secretary of the Treasury has promulgated, among other Iranian-related regulations, the Iranian Transactions and Sanctions Regulations codified in 31 C.F.R. part 560, which, in part, generally prohibit U.S. persons from doing business with Iran without a license from OFAC.

The Secretary has also promulgated regulations restricting other activities, for example, conducting business from the United States with designated terrorists (31 C.F.R. part 594). Treasury's sanctions regulations also prohibit persons from attempting to evade their restrictions. *See, e.g.*, 31 C.F.R. § 560.203. OFAC places persons whose property and interests in property have been blocked under one or

more sanctions regulations on its "Specially Designated Nationals and Blocked Persons List." 31 C.F.R. § 544.201, Note 1. As part of its sanctions regime, the Treasury Department has implemented regulations permitting OFAC to block transactions. *See, e.g.,* 31 C.F.R. §§ 594.201, 560.211; *see also Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 936 n.2 (D.C. Cir. 2013).

### B.    Congress Enacted the Victims Act After FSIA and TRIA to Establish an Orderly Process for Distributing Forfeitable Assets.

Congress has implemented a series of laws over the years to afford victims of terrorism means to collect their judgments against foreign states. Relevant here, in 2000, Congress enacted 28 U.S.C. § 1610(f)(1), which (among other things) permitted certain terrorism victims to satisfy some judgments against foreign states by attaching "property with respect to which financial transactions are prohibited or regulated" under specified sanctions statutes, including IEEPA. *See* 28 U.S.C. § 1610(f)(1). At the same time, Congress gave the President power to waive this provision—and the President immediately did so in a waiver that is still in force today, preventing creditors from using the section. *See id.* § 1610(f)(3); 65 Fed. Reg. 66,483 (Oct. 28, 2000).

Congress next passed TRIA in 2002, Pub. L. No. 107-297, § 201(a), 116 Stat. 2337 (codified at 28 U.S.C. 1610 note). In relevant part, TRIA states that "[n]otwithstanding any other provision of law," certain terrorism victims holding judgments against a "terrorist party" may attach "the blocked assets of that terrorist

party (including the blocked assets of any agency or instrumentality of that terrorist party)" to the extent of any compensatory damages.  TRIA § 201(a).  TRIA defines the term "blocked asset" as including assets "seized or frozen by the United States" under the Trading with the Enemy Act, 50 U.S.C. § 4301 *et seq*., or under IEEPA.  TRIA § 201(d)(2).  TRIA also specifies that the term "blocked asset . . . does not include property . . . that is subject to" certain licenses "for which the issuance of such license has been specifically required by statute other than [IEEPA] or the United Nations Participation Act of 1945."  *Id.*

Next, in 2008, Congress amended FSIA by enacting 28 U.S.C. § 1610(g). FSIA creates a background rule that makes foreign state property in the United States "immune from attachment . . . and execution except as provided in" 28 U.S.C. §§ 1610-1611.  *Id.* § 1609.  Various exceptions are set out in Section 1610(a) and 1610(b), but before 2008 FSIA "did not address expressly under what circumstances, if any, the agencies or instrumentalities of a foreign state could be held liable for judgments against the state."  *Rubin v. Islamic Republic of Iran,* 583 U.S. 202, 209 (2018).  Section 1610(g) addressed that issue and made clear that for FSIA purposes certain terrorism victims could look to the assets of a foreign state's agency or instrumentality to satisfy a terrorism judgment against the foreign state itself.  *Id.* at 213.  But a judgment holder invoking Section 1610(g) to defeat FSIA immunity must still identify an exception elsewhere in Section 1610.  *See id.*; 28 U.S.C.

§ 1610(g)(1) ("the property . . . is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section" (emphasis added)). One exception is 28 U.S.C. § 1610(a)(7), which creates an exception to the immunity of the property of a foreign state from attachment or execution under the FSIA, so long as judgment holders are seeking to attach property "used for a commercial activity in the United States[.]" *Id.*

Finally, in 2015 Congress decided to provide a means for terrorism victims to obtain compensation using a statutorily created fund as an alternative to independently pursuing collection actions. In passing the Victims Act, 34 U.S.C. § 20144, Congress sought to address, in part, challenges faced by terrorism victims in obtaining recoveries by creating a robust alternative to the limited attachment and execution remedies afforded by TRIA and FSIA. Specifically, the United States Victims of State Sponsored Terrorism Fund ("Compensation Fund") allows participating and eligible victims with judgments arising out of certain state-sponsored acts of international terrorism to obtain compensation with other similarly situated victims. 34 U.S.C. § 20144. Congress established the Compensation Fund with an initial deposit of $1.025 billion (*id.* § 20144(e)(5)) and the Fund continues to be financed by recoveries in forfeiture and other proceedings brought by the United States pertaining to state-sponsored terrorism (*id.* § 20144(e)(2)(A)). In 2019, Congress amended the enabling act, increasing the amount of civil recoveries

the Fund receives from fifty to seventy-five percent. Pub. L. 116-69, § 1701, 133 Stat. 1134, 1140 (Nov. 21, 2019).  And in 2022, Congress again amended the act through the Fairness for 9/11 Families Act, providing, in part, for catch-up payments for certain victims.  Pub. L. No. 117-328, div. MM, 136 Stat. 4459, 6106–11 (Dec. 29, 2022).  The United States understands that some, but not all, Creditors in this matter have registered voluntarily as claimants in the Compensation Fund.

## II.    WELLS FARGO BLOCKED THE TRANSFER OF THE FUNDS.

The Funds are the proceeds of the sale of a petroleum tanker called the *Nautic* or *Gulf Sky* by a Liberian subsidiary of a Greek company (Crystal Holdings) to Taif Mining.  JA198–99; *Levin I*, 45 F.4th at 417.  In connection with the sale, Taif Mining purported to be an Indian or Omani company, but, in actuality, it was a front company for two Iranian individuals and the companies they created to purchase the *Nautic* while attempting to avoid U.S. sanctions.  JA198–99; *Levin I*, 45 F.4th at 417–18.  As alleged by the United States, Taif Mining was a shell company for certain Iranian nationals linked to the Islamic Revolutionary Guard Corps among other entities designed by OFAC under various sanctions regulations, including the Global Terrorism Sanctions Regulations.  JA198–99; *Levin I*, 45 F.4th at 417–18.

After the transfer of a down payment and after Holman Fenwick Willan LLP, a law firm acting as an intermediary for the transaction, collected funds from Taif Mining, Holman Fenwick initiated a transfer to Crystal Holdings.  *See* JA199; *Levin*

*I*, 45 F.4th at 418.  Specifically, on October 23, 2019, Holman Fenwick originated a funds transfer for USD 9,983,931.91 from its bank, Lloyds Bank, to transfer the balance of the purchase price to Crystal Holdings.  JA199–200; *Levin I*, 45 F.4th at 418.  Specifically, Lloyds Bank sent a payment order to its intermediary bank, Wells Fargo, instructing Wells Fargo to in essence debit Lloyds Bank's account at Wells Fargo and credit the Wells Fargo account of Crystal Holding's bank, Credit Suisse, for its benefit.  *Id*.

After debiting the account of Lloyds Bank, but before crediting the account of Credit Suisse, Wells Fargo halted the transfer due to an OFAC concern.  *See* JA200; *Levin I*, 45 F.4th at 418.  Thereafter, OFAC issued blocking memoranda, formalizing the blocking of the specific funds under IEEPA, Executive Orders 13,224 and 13,886, and OFAC's Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594.  *See* JA200–01; *Levin I*, 45 F.4th at 418.  The funds in the Wells Fargo account are the "Funds" at issue in this matter and a portion of "Defendant Funds 2" in the Forfeiture Action.  *See* JA201.

## III.    THE UNITED STATES FILED ITS FORFEITURE COMPLAINT AND ARRESTED THE FUNDS.

After Wells Fargo blocked the Funds at OFAC's request, the United States sought to arrest and forfeit them and other monies used to purchase the *Nautic*.  *See* Forfeiture Action; *Levin I*, 45 F.4th at 418.  On May 1, 2020, the United States filed its Forfeiture Complaint.  JA273–85.  That same day, the Court issued to the United

States a warrant for arrest in rem.  Because the Funds were in the sole control of the United States—no person could access the Funds without the consent of the United States, specifically OFAC—the issuance of the warrant arrested the Funds.  *See* Fed. R. Civ. P. Supp. G(3)(b)(i), G(3)(c)(ii)(A).

After filing the Forfeiture Action, the United States applied for an OFAC license to receive the Funds.  *See* JA287–88.  On July 23, 2020, OFAC granted that request and issued a license to the United States to, in part, "engage in all transactions necessary and ordinarily incident to effect the forfeiture of" the Funds.  JA290.  The United States has obtained an extension of that license.  JA401–02.

## IV.    CREDITORS OBTAINED THE WRITS, WHICH THE DISTRICT COURT INITIALLY QUASHED.

On May 2, 2020, the Wall Street Journal published an article regarding the United States' Forfeiture Action and the criminal charges it brought against the individuals behind Taif Mining.  *See* JA293–96; *Levin I*, 45 F.4th at 418.  In that article, the Wall Street Journal reported that the Funds were being held at Wells Fargo.  JA293–96; *Levin I*, 45 F.4th at 418.  This prompted Creditors to seek the Writs.

### A.    Appellants Owens Creditors' Writs and Related Proceedings.

Relying on the facts developed in the United States' verified Forfeiture Complaint, the plaintiff group in *Owens v. Republic of Sudan*, Civ. A. No. 01-2244 (JDB) (D.D.C.), and consolidated and coordinated cases (the "Owens Creditors"),

filed a motion seeking writs to attach the Funds. *See id.*, R.450, JA72–75. Judge Bates granted the Owens Creditors' motion three days later, and the Owens Creditors thereafter moved to enforce their writs, seeking to compel Wells Fargo to turn the Funds over to them. *See id.* at R.451, JA76–78. Thereafter, the United States intervened in that action, opposed the Owens Creditors' motion to enforce, sought to quash the Owens Creditors' Writs, and asked Judge Bates to transfer those writ proceedings to now-Chief Judge Boasberg for coordinated proceedings with the Forfeiture Action.[1]

On January 15, 2021, Judge Bates severed the writ proceedings in *Owens* and related cases and transferred those proceedings to Judge Boasberg. *See* JA172–74. Thereafter, on March 4, 2021, Judge Boasberg rendered his initial decision quashing the Owens Creditors' Writs, reasoning that Iran held no attachable property interest in the Funds. *Levin v. Islamic Republic of Iran*, 523 F. Supp. 3d 14 (D.D.C. 2021) (Boasberg, J) (also available at JA177–94).

## B.    Appellants Levin Creditors' Writ and Related Proceedings.

During initial briefing in *Owens*, plaintiffs in *Levin v. Islamic Republic of Iran*, Civ. A. No. 05-2494 (JEB) (D.D.C.) (the "Levin Creditors"), who also hold a

---

[1]    The Owens Creditors also filed a claim in the Forfeiture Action, which is stayed pending the outcome of these writ proceedings. Forfeiture Action, Min. Order of Apr. 19, 2021.

judgment against Iran, sought a writ against the Funds. JA115–17. The district court solicited the views of the United States, and the parties agreed that the district court should transfer the proceeding to Judge Boasberg and issue the requested writ without prejudice to the United States seeking to quash it after issuance. JA121–22. The United States thereafter moved to quash the Levin Creditors' Writ, which Judge Boasberg granted in his first opinion quashing the Writs. JA177–94.

While the Levin Creditors' writ proceeding was pending before Judge Boasberg, the Levin Creditors filed other proceedings seeking additional writs in the Southern District of New York and the District of South Dakota. *See Levin v. Bank of N.Y.*, Civ. A. No. 09-5900 (S.D.N.Y.), R.1309; *Levin v. Islamic Republic of Iran*, Misc. No. 20-0035 (D.S.D.), R.3. Additionally, the Levin Creditors filed proceedings asking Judge Boasberg and the District of South Dakota to direct that the Funds be turned over to them. *See Levin v. Wells Fargo Bank*, N.A., Civ. A. No. 21-0420 (JEB) (D.D.C.) (which is before this Court on this Appeal); *Levin v. Wells Fargo Bank, N.A.*, Civ. A. No. 21-4024 (D.S.D.), R.1. These other proceedings are formally or functionally stayed pending the outcome of this matter.

## V.    THIS COURT REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

Judge Boasberg's initial decision reached only one of many dispositive arguments advanced by the United States—namely, the District Court held in its first decision that an originator of an interrupted funds transfer has no ownership interest

in funds blocked midstream. *Levin*, 523 F. Supp. 3d at 20. Creditors appealed that decision, and this Court reversed. The Court concluded that unlike a beneficiary's interest under TRIA in a blocked fund transfer where UCC Article 4A provides the relevant rule of decision, *Heiser*, 735 F.3d at 940, tracing supplies the rule of reason for measuring an originator's interest in a blocked funds transfer under TRIA. *Levin I*, 45 F.4th at 423–24. That is, the Court ruled that "terrorist victims may attach OFAC blocked electronic funds transfers if those funds can be traced to a terrorist owner" provided that "no intermediary or upstream bank asserts an interest as an innocent third party." *Id.*

In so ruling, the Court expressly noted that it was solely resolving the issue of whether Iran had an attachable property interest in the Funds under TRIA, remanding the case for the District Court to consider several alternative arguments for quashing the Writs. *Id.* at 424.

## VI.   ON REMAND, THE DISTRICT COURT AGAIN QUASHED THE WRITS FOR MULTIPLE INDEPENDENT REASONS.

On remand, the parties briefed the United States' alternative arguments for quashing the Writs. The United States argued that the Writs were not sustainable under TRIA because (1) TRIA applies only to assets frozen under IEEPA and the Funds here are not frozen, having been unfrozen by the United States obtaining an OFAC license for their disposition as the Fifth and Seventh Circuits have ruled in similar cases, *see United States v. Holy Land Found. Relief & Dev.*, 722 F.3d 677,

- 12 -

687 (5th Cir. 2013) ("TRIA could not be applied to . . . funds [subject to an OFAC license] since they no longer qualif[y] as blocked under that statute"); *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 622–25 (7th Cir. 2015) ("The [OFAC] license, coupled with the restrained status of the funds, rendered them unblocked under TRIA."); and (2) TRIA does not preempt the prior exclusive jurisdiction doctrine, which bars Creditors' Writs because another proceeding had already acquired in rem jurisdiction over the Funds, namely the Forfeiture Action, *see Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 466 (1939); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976).

As to FSIA, the United States showed attachment under FSIA was unavailable because, among other things, (1) the prior exclusive jurisdiction doctrine similarly bars attachment under FSIA when the Forfeiture Action had obtained in rem jurisdiction over the Funds; (2) the civil forfeiture statute, 18 U.S.C. § 981(c), expressly bars other actions from issuing orders regarding property arrested under forfeiture; and (3) the FSIA provision on which Creditors' reply, 28 U.S.C. § 1610(a)(7), requires assets to be used for "commercial activity in the United States" and the Funds here were not being used as such at the time of attachment (or for many months prior).

In quashing the Writs for a second time, the District Court largely adopted the United States' arguments. For TRIA, it found both that the Funds were not frozen under IEEPA due to the United States' OFAC license and that the prior exclusive jurisdiction doctrine prevented Creditors from obtaining orders regarding the Funds outside the Forfeiture Action. JA412–21. As to FSIA, the District Court held that the civil forfeiture statue expressly prevents courts from issuing orders regarding property arrested at forfeiture and that the Funds were not being used (and had not been used in the many months prior) for a commercial activity when Creditors obtained their Writs. JA421–27. In reaching those results, the District Court disagreed with Creditor's attempts in these proceedings to collaterally attack the Forfeiture Action's jurisdiction over the Funds and to measure the "commercial activity" requirement of FSIA at a time in the distant past. *Id.* In closing, the District Court noted, "[b]eyond the legal obstacles that prevent Plaintiffs from executing their writs here, allowing their actions to go forward would fundamentally undermine Congress's intended scheme for compensating victims of state-sponsored terrorism." JA427.

Therefore, the District Court again quashed Creditors' Writs. JA427–28. Creditors return to this Court challenging each of the District Court's holdings.

## SUMMARY OF THE ARGUMENT

Absent a statutory exception, the civil forfeiture statute prevents creditors from initiating process against property subject to a forfeiture proceeding. 18 U.S.C. § 981(c). Similarly, the prior exclusive jurisdiction doctrine prevents other actions from exercising in rem or quasi in rem jurisdiction over property that is subject to another in rem action. *Princess Lida*, 305 U.S. at 466. Indeed, it is a foundational concept of in rem jurisdiction that "the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts" to avoid inconsistent judgments and proceedings. *Colo. River*, 424 U.S. at 818. For Creditors to sustain their Writs they must find an exception to these background rules. Both Creditor groups have pointed to TRIA and the Owens Creditors have also pointed to FSIA as providing such an exception. As discussed herein, Creditors are mistaken—neither TRIA nor FSIA provides a basis for the Writs.

For TRIA, the Funds here do not fall into TRIA's definition of "blocked asset," which controls the scope of its attachment provisions. To be a "blocked asset" the Funds would have to be "frozen" under IEEPA. But they are not. Instead, pursuant to an OFAC license, they are arrested under forfeiture. Several courts of appeals have reached the same conclusion. *See R.J. O'Brien*, 783 F.3d at 626; *Holy Land*, 722 F.3d at 687; *see also Bank of N.Y. v. Rubin*, 484 F.3d 149, 150 (2d Cir. 2007). Moreover, nothing in TRIA purports to preempt bedrock jurisdictional

doctrines, including the prior exclusive jurisdiction doctrine, which prevents two actions from exercising in rem jurisdiction over the same property. *See Princess Lida*, 305 U.S. at 466; *Colo. River*, 424 U.S. at 818.

The provision of FSIA on which the Owens Creditors rely, 28 U.S.C. § 1610(a)(7), unlike TRIA, lacks any "notwithstanding any other provision of law" clause that could arguably exclude attachment under FSIA from the civil forfeiture statute's broad command that property arrested in forfeiture is "subject only to the orders and decrees of the court or the official having jurisdiction thereof[.]" 18 U.S.C. § 981(c). Moreover, attachment under FSIA Section 1610(a) requires that the property be used for a commercial purpose in the United States, and the Funds here clearly had no such use at the time Creditors obtained their Writs.

## STANDARD OF REVIEW

The district court quashed the Writs on threshold legal grounds. This Court reviews questions of law *de novo*. *Bennett v. Islamic Republic of Iran*, 618 F.3d 19, 21 (D.C. Cir. 2010).

## ARGUMENT

## I.    THE WRITS CANNOT BE SUSTAINED UNDER TRIA.

TRIA's attachment provision provides that:

*Notwithstanding any other provision of law,* and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of

> title 28, United States Code,[2] *the blocked assets* of that terrorist party
> . . . shall be subject to execution or attachment in aid of execution in
> order to satisfy such judgment[.]

TRIA § 201(a) (as amended by the Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. 112-158, 126 Stat. 1214, 1260 (Aug. 10, 2012)) (emphasis added). For two independent reasons, this provision provides no basis for the Writs. First, the Funds are not "frozen" under IEEPA, and thus, the Funds fall outside TRIA's attachment provisions because they do not count as "blocked assets" for these purposes. Second, TRIA's "notwithstanding any other provision of law" clause does not create exceptions to bedrock jurisdictional principles, such as the prior exclusive jurisdiction doctrine.

## A.    The United States' OFAC License Un-Froze the Funds.

The Funds here are not "blocked assets" as that phrase is used in TRIA, and thus, they cannot be attached under that statute. As noted above, TRIA's attachment provisions only apply to "blocked assets." TRIA § 201(d)(2); *R.J. O'Brien*, 783 F.3d at 622. TRIA itself defines "blocked asset" to mean:

> any asset seized or frozen by the United States . . . under sections 202
> and 203 of the International Emergency Economic Powers Act
> (50 U.S.C. 1701; 1702)[.]

TRIA § 201(d)(2)(A).

---

[2]    The prior detailed provisions of Section 1605(a)(7) were subsequently moved to 28 U.S.C. § 1605A. *See Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1606 (2020).

TRIA then carves out certain assets that while seized or frozen by the United States under IEEPA, have other characteristics exempting them from the definition: (1) certain property subject to the Vienna Convention; and (2) property that is subject to a final disposition license under another blocking statute—i.e., even if no IEEPA license has been issued a license under another overlapping blocking regime will "unblock" the assets too.  TRIA § 201(d)(2)(B).

Thus, for the Funds to be subject to TRIA's attachment provisions they must both be "seized or frozen" under IEEPA and also not subject to a license for disposition under another statute.

### 1.     The Funds Were Never Seized Under IEEPA

There can be no serious dispute that the Funds were never "seized" under IEEPA.  While the verbs in IEEPA's operative provision, 50 U.S.C. § 1702, and those in TRIA are not the same, TRIA's use of "seized" appears to contemplate assets described in IEEPA Section 1702(a)(1)(C), which permits the President to "confiscate" certain property. 50 U.S.C. § 1702(a)(1)(C).  That is, TRIA's reference to an asset "seized" under IEEPA appears to refer to IEEPA's confiscation provisions as no other provision of the referenced IEEPA sections allows the United States to take possession of an asset.  *See generally* 50 U.S.C. §§ 1701, 1702; *R.J. O'Brien*, 783 F.3d at 625 (discussing limits of the Executive's powers under IEEPA; "IEEPA, for example, does not speak of applications for warrants of arrest in rem.").

IEEPA's "confiscation" provisions, however, only apply "when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals[.]"  50 U.S.C. § 1702(a)(1)(C).  These circumstances are not present here, and OFAC did not invoke any powers to "confiscate" property when it initially blocked the Funds under IEEPA.  *See* Blocking Memos., JA269–71.

## 2.    The Funds Are Not Frozen Under IEEPA.

The Funds are similarly not "frozen" under IEEPA.  As an initial matter, while TRIA's "blocked asset" definition is keyed to "any asset . . . frozen by the United States" under IEEPA Sections 1701 and 1702, the referenced provisions of IEEPA do not use the terms "freeze" or "frozen."  50 U.S.C. §§ 1701, 1702.  Instead, IEEPA Section 1702(a)(1)(B) permits the Executive to "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit" activities and transactions involving identified property.   50 U.S.C. § 1702(a)(1)(B).   TRIA itself does not define which verbs in IEEPA Section 1702(a)(1)(B) are encompassed by its use of the term "frozen."  *Rubin*, 484 F.3d at 150 (adopting reasoning of *Weinstein v. Islamic Republic of Iran*, 299 F. Supp. 2d 63, 74 (E.D.N.Y. 2004) ("Unfortunately, these terms are not further defined in the TRIA.  And the terms 'seized' and 'frozen' do not appear in . . . IEEPA")).

Importantly, Congress clearly did not intend to equate assets "frozen" under IEEPA with those merely regulated by the statute.  This is because the language

Congress used in TRIA is more limited than the parallel, but currently inoperable, provision of FSIA governing attachment of IEEPA-related assets. The currently inoperable provision of FSIA, passed before TRIA, covers "any property with respect to which financial transactions are *prohibited or regulated pursuant*" to IEEPA. 28 U.S.C. § 1610(f)(1) (emphasis added). By contrast, TRIA only covers assets "seized or frozen by the United States" under IEEPA. TRIA § 201(d)(2). Had Congress wished to encompass all assets subject to regulation under IEEPA Section 1702(a)(1)(B), it knew how to enact such a law—yet it did not do so in TRIA. *See Weinstein*, 299 F. Supp. 2d at 75 ("Given that not every type of action authorized by the IEEPA necessarily involves a seizing or freezing of property, it follows that not every action regarding property under the authority of the IEEPA . . . results in the property being 'blocked' under the TRIA.").

Against this backdrop, the "frozen" assets subject to TRIA's attachment provisions are those where the Government has prohibited all transactions in them—i.e., fully immobilized them under its blocking authorities. This is consistent with the Supreme Court's use of the term when discussing the reach of IEEPA. *Dames & Moore v. Regan*, 453 U.S. 654, 673 (1981) (IEEPA blocking "orders permit the President to maintain the foreign assets at his disposal[;]" "[t]he frozen assets serve as a 'bargaining chip' to be used by the President when dealing with a hostile country."). It is also consistent with the use of the term in other financial

enforcement arenas. *See Fed. Trade Comm'n v. Pukke*, 53 F.4th 80, 109 (4th Cir. 2022) ("[a]n asset freeze immobilizes a party's funds by government mandate"); *Anderson v. Stephens*, 875 F.2d 76, 79–80 (4th Cir. 1989) ("we hold that the freeze order implicitly prohibited *any* banking activity with regard" to the at issue account (emphasis in original)).

Under this best interpretation of TRIA's scope, the Funds here are plainly not frozen. The United States obtained from OFAC a license permitting it to "engage in all transactions necessary and ordinarily incident to effect the forfeiture of" the Funds. OFAC License, JA290–91; OFAC License Renewal, JA401–02. Because the Funds can be used for a legal purpose, the District Court correctly concluded that the Funds are no longer "frozen" under IEEPA. JA412–16. This understanding is fully consistent with OFAC's IEEPA licensing regulations. 31 C.F.R. § 535.502 (Effect of license or authorization) (a license "authorizing a transaction otherwise prohibited under this part has the effect of removing a prohibition or prohibitions in subpart B from the transaction"); *see also Weinstein*, 299 F. Supp. 2d at 74.

This understanding of TRIA's attachment provisions has been adopted by several Circuits. Specifically, the Second, Fifth, and Seventh Circuits have held that if an otherwise "blocked" transaction is subject to an OFAC license, it is not "frozen" for purposes of TRIA. *See R.J. O'Brien*, 783 F.3d at 625-26; *Holy Land*, 722 F.3d at 687; *Rubin*, 484 F.3d at 150. This is because when OFAC issues a license to

engage in transactions with previously blocked property, it authorizes a legal use for them.

As the Seventh Circuit in *R.J. O'Brien* explained, when the government seeks forfeiture under an OFAC license, those efforts render the property not "frozen" under IEEPA. In that case, as here, the Government sought to forfeit certain terrorist-related assets, arresting them in a forfeiture action and obtaining an OFAC license to pursue their forfeiture. *R.J. O'Brien*, 783 F.3d at 613, 615. In ruling that TRIA attachment of the property sought to be forfeited was improper, the court concluded that "once the United States executed its warrants of arrest in rem, the funds—at least by that point—were no longer 'seized or frozen' as TRIA contemplates the terms . . . Instead, the funds were seized under civil forfeiture." *R.J. O'Brien*, 783 F.3d at 625. That is, the court concluded that assets subject to a forfeiture action and an OFAC license permitting forfeiture are not "frozen" under IEEPA because they are unblocked for a lawful disposition.

Also, in *Holy Land*, 722 F.3d at 687, the Fifth Circuit reached the same conclusion. There, the Government obtained a restraining order under criminal forfeiture pursuant to an OFAC license. *Id.* Once again, the court concluded that those activities rendered un-frozen the assets at issue. Specifically, the court concluded that "an OFAC-issued license authorizing a transaction involving blocked funds has the effect of removing the prohibition on dealing in those funds." *Id.*

- 22 -

at 686.  This is because TRIA does not "reach those funds which the government has been given authorization to control through another means" through an OFAC license and forfeiture authorities.  *Id.* at 685.

The Second Circuit has similarly held that assets otherwise subject to OFAC regulation under IEEPA are not "frozen" when a party obtains an OFAC license to transact in them.  Specifically, in *Rubin*, the Second Circuit held that when IEEPA-blocked assets are also the subject of an OFAC license, the assets are beyond the reach of TRIA's attachment provisions.  484 F.3d at 150.  In so ruling, the Second Circuit adopted the reasoning of the district court in that case and *Weinstein*, the latter explaining the limits of TRIA attachment and that its scope does not include assets subject to an OFAC license.

These authorities make clear that when OFAC issues a license in connection with the property, including to the Government to seek the forfeiture of the property, the property ceases to be "frozen" under IEEPA.  These persuasive holdings prevent Creditors from usurping the Funds for their own after the United States filed the Forfeiture Action against them and has an OFAC license permitting the same.  In short, as the District Court correctly held, the Government's actions un-froze the assets, placing them beyond the coverage of TRIA's attachment provisions.

### 3.    Creditors' Arguments to the Contrary Are Misplaced.

Creditors seek to reverse the District Court's ruling, advancing a series of arguments.  None have merit.

*First*, the Owens Creditors (but not the Levin Creditors) at times contend that the Court already resolved this issue on the parties' first visit to this Court.  Owens Br. at 22–23.  Elsewhere, however, they recognize that the Court merely addressed whether Iran had "an ownership interest in the Funds that could allow [Creditors] to attach them under TRIA[.]"  *Id.* at 3; *see also id.* at 16 ("The Court reversed the district court's judgment and remanded without addressing other issues.").  In all events, any suggestion that this Court addressed the United States' alternative arguments for affirmance in *Levin I* is incorrect.  While the United States advanced the argument that the Funds were not frozen under IEEPA as an alternative ground for affirmance in *Levin I*, *see* No. 21-7036, Gov't Br. at 47-48 (filed Jan. 21, 2022), the Court expressly did not reach the United States' alternative arguments.  JA211; *Levin I*, 45 F.4th 416 ("The district court's judgment rested entirely on this holding"—that Iran had no attachable interest in the Funds—"and its decision is all that we have addressed.").  Accordingly, the Court's prior decision compels no result here.

- 24 -

*Second*, Creditors contend that an exception to TRIA's definition of "blocked asset" (TRIA § 201(d)(2)(A))[3] limits which licenses can place assets outside the reach of TRIA's attachment provisions. Specifically, Creditors argue that because TRIA carves out of its definition of "blocked asset" property that is subject to OFAC licenses under other sanctions regimes, only a license meeting the carveout can place an asset beyond the reach of TRIA. Owens Br. at 23–26; Levin Br. at 42–43. Creditors misread the statute.

The exceptions to TRIA's definition of blocked asset only apply when an asset remains seized or frozen under IEEPA. TRIA § 201(d)(2). That is, even if an asset counts as being seized or frozen under IEEPA—thus meeting the threshold requirement to be a TRIA "blocked asset"—an asset will nonetheless fall outside TRIA's definition if it is the subject of a license under another sanctions regime. The rationale for this exception is clear. The United States has many overlapping sanctions regimes. *See, e.g.*, *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 723 (11th Cir. 2014) ("OFAC also has blocking authority under other legislation not mentioned in TRIA § 201[.]"). As such, if an asset is both frozen under IEEPA and blocked under another statute, a license under that other act will

---

[3]     As noted above, this provision creates an exception for property that is subject to a license issued "for final payment, transfer, or disposition" when "the issuance of such license has been specifically required by statute other than" IEEPA and the United Nations Participation Act. TRIA § 201(d)(2)(A).

place the asset beyond the reach of TRIA even if no license was issued under IEEPA. TRIA § 201(d)(2).  But the exceptions are unnecessary to consider if an asset no longer remains "frozen or seized" under IEEPA as the threshold requirement to be a TRIA "blocked asset" is not satisfied.  Put another way, if an asset is blocked under a statute not mentioned in TRIA, the asset is plainly not attachable under TRIA because it is not "seized or frozen" under the identified statutes regardless of whether OFAC has issued a license under the other blocking statute.

Indeed, understood properly, this statutory text supports, rather than undermines, the District Court's interpretation.  That is, the exceptions demonstrate both (1) Congress's understanding that OFAC licensing un-freezes assets under sanctions regimes and (2) its desire to exclude assets subject to overlapping sanctions regimes where a license has been given under one of those regimes.  Of course, Congress did not need to provide an express exception to TRIA's "blocked asset" definition for assets solely regulated by and receiving a license under IEEPA because plainly such an asset would not satisfy the statute's threshold requirement for a "blocked asset" when an IEEPA license un-froze those assets.

Creditors' reading also turns the logic of the exceptions on its head.  TRIA's exceptions to its definition of "blocked asset" seek to further constrain or limit that definition.  In other words, without the carveouts to "blocked asset" for assets subject to licenses under other sanctions regimes the meaning of "blocked asset" would be

more capacious and plainly turn on whether an asset is "seized or frozen" under IEEPA alone.  Creditors, however, suggest that by adding the limiting carveouts, Congress somehow expanded the reach of the threshold requirement.

Ultimately, nowhere in TRIA's text does it suggest that the threshold requirement of a "blocked asset"—i.e., one "seized or frozen" under IEEPA—turns on whether a license under another regime also un-froze the asset.  The clear weight of persuasive authorities has consistently held that an asset otherwise blocked under IEEPA but subject to an OFAC license is not frozen under IEEPA as TRIA requires at the threshold for its attachment provisions to apply.

*Third*, relying again on the carveouts to TRIA's definition of "blocked asset," Creditors suggest that the United States' license does not count because it does not "provide for the 'final payment, transfer, or disposition'" of the Funds.  Owens Br. at 29–30; Levin Br. at 40–42.  Specifically, Creditors contend that because the United States' license is conditioned on it "furnishing a valid forfeiture order" to Wells Fargo that somehow the license does not provide for a final disposition.  *See id.* (quoting License Renewal, JA402).  As an initial matter, the "final disposition" language is a requirement of the "blocked asset" carveout, not a condition of the threshold definition that subjects only assets "seized or frozen" under IEEPA to collection.  As such, this argument fails because, as demonstrated above, the carveout does not control the disposition of this matter.

- 27 -

But even if it did, Creditors cite nothing to support this confounding argument. Nor do they explain how forfeiture, which is authorized by the license here, is not a final disposition. Of course it is. 18 U.S.C. § 981(f) (title "shall vest in the United States upon commission of the act giving rise to forfeiture under this section"). Instead, Creditors attempt to conflate a "final" disposition with an "unconditional license," but nothing in TRIA supports that view.

Moreover, Creditors err in suggesting that because the United States still needs to obtain a final order of forfeiture to obtain title, the license does not permit the United States to take any action at this stage. The United States' license contains two authorizations, one in subsection (a)—which un-freezes the Funds by permitting the United States "to engage in all transactions necessary and ordinarily incident to effect the forfeiture of" the Funds—and a second in subsection (b)—which authorizes "all U.S. financial institutions and [the United States] to engage in all transactions necessary and ordinarily incident to relinquish custody of" the Funds, i.e., their final disposition. License Renewal, JA402. While the second is subject to the condition that the United States furnish a final order of forfeiture to Wells Fargo, that is a condition otherwise imposed by law as without a final order of forfeiture the United States has no title to the Funds. At bottom, the United States' OFAC license allows for it to engage in activities and ultimately take possession and title to the Funds should other legal requirements be satisfied. Owens Br. at 29–30; Levin

Br. at 40–42.  As such, even were the carveout's "final disposition" requirement a necessary element to un-freeze the Funds under IEEPA, which the text of the statute does not mandate, the Government's license plainly satisfies this requirement.

*Fourth*, the Owens Creditors suggest that while a general IEEPA license may un-freeze assets under IEEPA, a specific license does not.  Owens Br. at 26–29.  In making this argument, the Owens Creditors suggest that a license must have "categorically unfroze[n] the Funds under IEEPA" for it to count.  *Id.* at 28.  The Owens Creditors cite nothing in TRIA's text suggesting that an asset must be unblocked for all purposes under IEEPA to be un-frozen or any distinction between general and specific licenses.  Moreover, the regulations they cite do not create any differences in the authorities granted under general versus specific licenses.  For example, the definitions of these terms in the Global Terrorism Sanctions Regulations provide "[t]he term *general license* means any license or authorization the terms of which are set forth in subpart E of this part" and "[t]he term *specific license* means any license or authorization not set forth in subpart E of this part but issued pursuant to this part."  31 C.F.R. §§ 594.307(b), (c).  Nothing in these definitions suggests that one unfreezes assets under IEEPA but the other does not.  The operative provision of the Global Terrorism Sanctions Regulations describing the effect of having a license creates no distinction in the authority that a general versus specific license provides.  *See* 31 C.F.R. § 594.502(c).  Instead, the operative

provisions use the term "license," which is defined to mean both general and specific licenses. 31 C.F.R. § 594.307(a).

Moreover, neither general licenses nor specific licenses unblock assets for all purposes, so Creditors' suggested requirement would mean that no IEEPA license (the established mechanism to engage legally with IEEPA blocked assets) could effectively "un-freeze" assets and place them beyond attachment under TRIA. Instead, general licenses unblock assets for specified transactions and uses just like specific licenses but address scenarios that frequently arise. For example, OFAC has promulgated a general license under its Iranian Transactions and Sanctions Regulations for journalistic activities, establishment of news bureaus in Iran, and transactions "ordinarily incident" thereto. 31 C.F.R. § 560.519. Obviously, transactions falling into that general license and the funds used in those transactions are "un-frozen" for purposes of IEEPA such that Creditors here could not seek to attach a major network's television cameras used to record an interview of an Iranian official for a news report. *See id.* But equally obvious, if those cameras were used to record recruitment videos promoting Iran's support of Hamas, those transactions would not be "ordinarily incident" to the permitted activities. *Id.*

The same goes here—under the United States' specific license it is authorized to forfeit the Funds and engage in transactions necessary to do so, but it is not authorized under the specific license to take the Funds and use them for another

purpose. License Renewal, JA402. The Court should reject the Owens Creditors' atextual attempt to have TRIA attachment turn on the method of OFAC licensing to unfreeze IEEPA blocked assets. Also, the United States has general licenses for its official activities. *See* 31 C.F.R. §§ 560.557, 594.518, 596.507. As such, were a general license required to unfreeze IEEPA blocked assets for purposes of TRIA, that requirement has been satisfied here where the Government is pursuing the Forfeiture Action in conducting its official business.

*Fifth, and lastly*, the Owens Creditors argue that their Writs were obtained before the United States received its OFAC license to forfeit the Funds, and thus, there is no basis to quash their Writs. Owens Br. at 33–34. Not so. The Seventh Circuit in *R.J. O'Brien* considered this precise issue and specifically rejected the argument raised by the Owen Creditors here. In that case, the Government produced its OFAC license for the first time on appeal as a supplement to the trial court record. 783 F.3d at 623. Nonetheless, the court found that it, combined with the Government's forfeiture efforts, operated to unblock the assets at issue placing them outside the coverage of TRIA. *Id.* Specifically, the court reasoned, "[t]hat the United States or the district court, at one point or another, found the funds to be blocked does not render them blocked now." *Id.*

"TRIA, moreover, 'does not guarantee that any blocked assets will in fact be available when a particular victim seeks to execute on a judgment.'" *Id.* (quoting

- 31 -

*Smith v. Fed. Reserve Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003)). This is because IEEPA gives the President broad authorities to regulate terrorist assets. *Smith*, 346 F.3d at 271. But, "[i]t imposes no obligation on the President to maintain such funds for future attachment." *Id.* Indeed, "Congress implicitly acknowledged that not all assets procured by the United States from terrorists would be available for execution pursuant to TRIA § 201." *Id.* To hold otherwise would restrict the Executive's prerogatives to augment the Government's sanctions to further diplomacy or to meet the Nation's ever-changing needs to combat terrorism and those that support it. As such, regardless of whether the Funds were "blocked" for purposes of TRIA when the Owens Creditors obtained their Writs, the Funds are not blocked now, and thus, the Owens Creditors' Writs and attempts to execute on them are no longer valid even if they once were. Indeed, the Owens Creditors cite nothing that would allow them to continue to maintain, and execute on, their Writs when the legal basis for doing so (i.e., the "frozen" nature of the Funds) has subsided. Notably, the Levin Creditors do not make this argument presumably because the United States' OFAC license predates their writs. *Compare* Initial License, JA290–91, *with* Levin Writs, JA123–27.

### B. The Prior Exclusive Jurisdiction Doctrine Prevents In Rem Jurisdiction Over the Funds in These Writ Proceedings

Even were the Funds within the ambit of TRIA's attachment provision, TRIA does not provide for the attachment of assets subject to the in rem jurisdiction of a

civil forfeiture proceeding.  This is because TRIA's "notwithstanding" clause only places TRIA in a place of precedence vis-à-vis conflicting "provisions of law," not common law jurisdiction precepts that are central to due process.

**1.    TRIA's "Notwithstanding" Clause Does Not Exempt It From Bedrock Jurisdictional Principles.**

As noted above, TRIA Section 201(a) provides generally that the "blocked assets" of a terrorist organization are subject to attachment by victims with a terrorism-related judgment "[n]otwithstanding any other provision of law[.]"  TRIA § 201(a).  As this Court has recently recognized, the meaning of this phrase "is at best ambiguous." *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023) (TRIA's "notwithstanding" clause did not clearly abrogate sovereign immunity), *reh'g en bacn denied*, 2023 WL 4534923 (D.C. Cir. Jul. 10, 2023), *cert. denied*, 2024 WL 72022 (Jan. 8, 2024).  Specifically, this Court has concluded there is a reasonable reading that the phrase only applies to "provisions of law"—i.e., "[a] clause in a statute, contract, or other legal instrument[,]" Black's Law Dictionary (11th ed. 2019) (definition of "provision")—and not to common law doctrines. *Greenbaum*, 67 F.4th at 432.  "Congress has recognized that the phrase 'other provision of law' does not clearly extend beyond statutory law" as Congress in other contexts has included "parenthetical[s] expressly giving it a more expansive sweep" to include non-statutory sources. *Greenbaum*, 67 F.4th at 433.

- 33 -

This is important here as an ages-old common law jurisdictional limitation prevents a court from exercising in rem jurisdiction over a piece of property that is already subject to in rem jurisdiction in another proceeding.  This doctrine, often called the "prior exclusive jurisdiction doctrine," recognizes that only one proceeding may exercise in rem jurisdiction over a piece of property to avoid inconsistent judgments and rulings.  *See, e.g., Darlak v. Columbus-Am. Discovery Grp., Inc.*, 59 F.3d 20, 22 (4th Cir. 1995) ("Actions in rem, or 'against the thing,' are designed to adjudicate rights in specific property as against all of the world[.]").  That is, "if the two suits are in rem, or quasi in rem . . . the jurisdiction of the one court must yield to that of the other[.]"  *Princess Lida*, 305 U.S. at 466.  As such, "the court first assuming jurisdiction over property may exercise that jurisdiction to the exclusion of other courts[.]"  *Colo. River*, 424 U.S. at 818; *see also* Wright & Miller, 13F Fed. Prac. & Proc. Juris. § 3631 (3d ed., Oct. 2020) (when a court "has obtained possession, custody, or control of particular property, that authority and power over the property may not be disturbed by any other court" (collecting citations)).

Here, as Judge Boasberg correctly concluded, because the District Court in the Forfeiture Action first obtained in rem jurisdiction over the Funds, it acquired exclusive jurisdiction over them.  JA416–21.  As such, Judge Bates who issued the Owens Creditors' Writs, and the District Court in the *Levin* case, lacked the authority

- 34 -

to authorize process over the Funds in issuing the Writs. *See also, e.g., Palmer v. Texas*, 212 U.S. 118, 129 (1909) ("The possession of the res vests the court which has first acquired jurisdiction with the power to hear and determine all controversies relating thereto, and, for the time being, disables other courts of co-ordinate jurisdiction from exercising like power.") (quoting *Farmers' Loan & Tr. Co. v. Lake St. Elevated R. Co.*, 177 U.S. 51, 61 (1900)).

Although Creditors may argue that the term "provision of law" is ambiguous on its face and should be read to encompass common law jurisdictional precepts, nothing in the text of TRIA makes any mention of doing so. Congress is presumed to know the significance of distinctions between "provisions of law" and other sources of law, such as jurisdictional maxims. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). And "[i]n this, as in any field of statutory interpretation, it is [the judiciary's] duty to respect not only what Congress wrote but, as importantly, what it didn't write." *Va. Uranium v. Warren*, 139 S. Ct. 1894, 1900 (2019).

And of course, TRIA's "notwithstanding" clause must be afforded the same meaning in this suit as it was in *Greenbaum* to avoid "the dangerous principle that judges can give the same statutory text different meanings in different cases." *Clark*

*v. Martinez*, 543 U.S. 371, 386 (2005). That is, because this Court has rejected an interpretation of TRIA's "notwithstanding" clause that encompasses all other sources of law, interpreting the clause to sweep an ancient jurisdictional limitation of in rem jurisdiction into its coverage would carve out one jurisdictional precept (sovereign immunity) but include another (the prior exclusive jurisdiction doctrine). Even conceding sovereign immunity is subject to a clear statement rule, while common law rules are instead subject to a rebuttal presumption that statutes do not disturb them, there is no indication that Congress intended to pick and choose between these bedrock jurisdictional concepts in the same phrase.

Notably, other courts considering TRIA's "notwithstanding" clause have understood it "can operate only to override conflicting *statutes*." *Holy Land*, 722 F.3d at 687 (emphasis added). The same is true with other statutory "notwithstanding" clauses. *See also United States v. Puentes*, 803 F.3d 597, 606 (11th Cir. 2015) ("'[n]otwithstanding any other provision of law,' a phrase which we read as 'Congress's indication that the statute containing that language is intended to take precedence over any preexisting or subsequently-enacted *legislation* on the same subject'") (emphasis added); *Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1068 (9th Cir. 2011) ("a statute prefaced by 'notwithstanding any other provision of law' 'must prevail over directly contradictory provisions in other *statutes*'") (emphasis in original omitted; emphasis added); *United States v.*

*Fernandez*, 887 F.2d 465, 468 (4th Cir. 1989) ("'notwithstanding any other provision of law[:]' [t]his proviso naturally means that the conferral of prosecutorial powers should not be limited by other *statutes*") (emphasis added).  None has held those clauses to supersede fundamental jurisdictional doctrines.

In what appears to be the only other case considered by this Court where a party claimed a "notwithstanding" clause abrogated a jurisdictional limitation, the Court rejected that contention.  In *Mobilfone Service, Inc. v. FCC*, 79 F. App'x 445, 446-47 (D.C. Cir. 2003), this Court refused to interpret a "notwithstanding any other provision of law" clause to preempt jurisdictional conditions to suit.  In that case, an agency denied a small business a bidding credit because it failed to provide certain information.  *Id.* at 446.  Before seeking a final order of the agency, the small business brought a petition for review in this Court, contending that the regulation requiring the information failed to display a correct control number as required by the Paperwork Reduction Act.  *Id.*  The Paperwork Reduction Act provided that "notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information" if the "the collection of information does not display a valid control number[.]"  *Id.* (citing 44 U.S.C. §§ 3512(a)(1), (b)).

Notwithstanding the "notwithstanding" clause, the Court rejected the challenge, finding that it lacked jurisdiction because there was no final agency order

to review—a jurisdictional requirement of the Communications Act and Hobbs Act. *Id.* at 447. Specifically, although the jurisdictional requirement was undoubtedly a statutory provision, the Court reasoned the "notwithstanding" clause did "not authorize a litigant to initiate a judicial proceeding where one does not otherwise exist." Ultimately, the Court rejected the petitioner's contention that the "notwithstanding" clause superseded the "jurisdictional prerequisites" at play. This Court is not the only court to hold this view. *See Sallee v. United States*, 41 Fed. Cl. 509, 515 (1998) ("notwithstanding" clause in Contract Disputes Act did not preempt "the basic jurisdictional prerequisites needed to file a claim under the" Act); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 52 (1st ed. 2012) ("A statute will be construed to alter the common law only when that disposition is clear."). The Court should similarly conclude here that TRIA's "notwithstanding" clause does not abrogate bedrock jurisdictional requirements.

Lastly, an opposite approach has no limiting principle and would lead to absurd results. If TRIA's "notwithstanding" provision meant to abrogate the prior exclusive jurisdiction doctrine and permit TRIA creditors to obtain attachment and execution against property already in the in rem jurisdiction of other proceedings, TRIA would promote not just a race to the courthouse for TRIA creditors, but a race to compel the judges hearing their proceedings to act. This is because if the statute renders dead letter the prior exclusive jurisdiction doctrine for TRIA creditors, it

would permit any TRIA creditor to institute their own attachment and turnover proceedings notwithstanding any prior pending proceedings brought by other TRIA creditors.  Under Creditors' reading, a multitude of courts could issue conflicting orders directing that "blocked assets" of a terrorist entity be turned over to one TRIA creditor over other TRIA creditors notwithstanding a prior court having in rem jurisdiction over the property.

Here that is particularly relevant as there would be nothing providing the Owens Creditors (Creditors who first obtained a writ as to the Funds) priority over the Levin Creditors' similar attempts to claim the Funds as their own.  The Levin Creditors could push the South Dakota or New York judges where their other related proceedings are pending to issue urgent orders, leapfrogging the Owens Creditors here despite the Owens Creditors getting their writs first.  Similarly, other TRIA creditors could file writ proceedings right now in other courts around the country, claiming the Funds as their own.  Reading Congress's carefully crafted language to place TRIA above all other sources of law instead of just other conflicting substantive "provisions of law" would create chaos, undermining not just Congress's recent enactments regarding the Compensation Fund, but fundamental concepts of due process and an orderly judiciary.  Indeed, Creditors' approach ignores the historical context against which Congress passed TRIA and the latter enacted Victims Act, a factor the Supreme Court has considered in construing terrorism-

related collection statutes. *See Rubin*, 583 U.S. at 218 (concluding that certain amendments to FSIA did not provide a freestanding basis to attach and execute against the property of a foreign state).

Because TRIA does not purport to abandon the centuries-old foundational jurisdictional rule embodied in the prior exclusive jurisdiction doctrine, the Court lacked authority to issue the Writs as the Funds were already subject to the in rem jurisdiction of the Forfeiture Action.

### 2.    Creditors' Arguments to the Contrary Are Unavailing.

Creditors disagree that the ancient prior exclusive jurisdiction doctrine applies to this matter. Owens Br. at 35–52; Levin Br. at 47–70. Creditors are mistaken.

*First*, Creditors argue that the doctrine has been displaced by the civil forfeiture statute's exclusive jurisdiction provision. Owens Br. at 37–39. Creditors cite no case that has reached that conclusion and the statutory text of Section 981(c) fails to support that contention. To the contrary, courts continue to use the doctrine in the context of civil forfeiture litigation.

For example, 21 U.S.C. § 881 is a civil forfeiture statute governing controlled substances-related properties. It has an identical exclusive jurisdiction provision as 18 U.S.C. § 981. *Compare* 21 U.S.C. § 881(c), *with* 18 U.S.C. § 981(c). In *United States v. $79,123.49 in U.S. Cash*, 830 F.2d 94, 99 (7th Cir. 1987), the Seventh Circuit considered whether Section 881 displaced the prior exclusive jurisdiction

doctrine and permitted the United States to pursue forfeiture when a state court had exercised in rem jurisdiction over the property. The Court found that it did not, holding, "nothing in § 881 purports to supersede the rule of prior exclusive jurisdiction." *Id.*; *see also Scarabin v. DEA*, 966 F.2d 989, 993 (5th Cir. 1992) ("The basic requirement of jurisdiction in rem . . . is that a court must have exclusive possession or control over the property in order to consider the suit and grant or deny the relief sought."). Indeed, even when courts have rejected the doctrine as a barrier, they have done so because the requirements of the doctrine were not satisfied, not because it has been abrogated. *See, e.g.*, *United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 660 (6th Cir. 2003); *United States v. $99,500 in U.S. Currency*, 339 F. Supp. 3d 690, 700 (N.D. Ohio 2018), *aff'd*, 795 F. App'x 332 (6th Cir. 2019).

Moreover, nothing in the text of Section 981(c) alludes to displacing the common law or foundational concepts of in rem jurisdiction. To the contrary, it expressly references that its exclusivity provision rests with an "official having jurisdiction thereof." 18 U.S.C. § 981(c). That is, far from abrogating in rem jurisdictional concepts, the Owens Creditors invite this Court to find an implied abrogation of an ancient axiom of in rem jurisdiction from a statute that expressly references background "jurisdiction." *See Noble Prestige Ltd. v. Galle*, 83 F.4th 1366, 1377 (11th Cir. 2023) (describing the doctrine as the "ancient and oft-repeated

doctrine of prior exclusive jurisdiction"); Scalia, *supra*, § 53 ("A statute that uses a common-law term, without defining it, adopts its common-law meaning."). The Court should decline Creditors' invitation to hold that the civil forfeiture statute has sub silentio abrogated a bedrock understanding of in rem jurisdiction (especially when Creditors claim the exclusivity provision of that forfeiture statute does not apply here, Owens Br. at 38–39).[4]

*Second*, Creditors argue that the doctrine is a mere "provision of law," which Congress meant to nullify through TRIA's "notwithstanding" provision, citing general holdings on the meaning of similar clauses. Owens Br. at 38–39; Levin Br. at 47–59. But general holdings as to other clauses are not dispositive here (as the Owens Creditors suggest, Owens Br. at 42) because the Court has already ruled in *Greenbaum*, 67 F.4th at 432, that it is ambiguous whether Congress intended TRIA's "notwithstanding" clause to preempt both statutory and common law doctrines. *Id.* ("The phrase 'other provision of law' is at best ambiguous."). While the Court also recognized that "[l]egislative displacement of federal common law does not require

---

[4]    The Owens Creditors misunderstand *United States v. PetroSaudi Oil Services (Venezuela) Ltd.*, 70 F.4th 1199, 1209 (9th Cir. 2023), in suggesting that the United States has argued that civil forfeiture statutes have displaced the prior exclusive jurisdiction doctrine as a general matter. The argument in that case was confined to 28 U.S.C. § 1355(b)(2), which expressly authorizes U.S. courts to exercise jurisdiction over property that has been seized by a foreign government. That context is far removed from Creditors' attempt to cast aside the doctrine here.

the same sort of evidence of a clear and manifest congressional purpose demanded for preemption of state law," *id.* at 434 (quoting *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 423 (2011)), undoubtedly there must be some indication in the statutory text or context on which to base a holding that Congress intended to disrupt the common law status quo, especially as to a doctrine the Supreme Court has held to be foundational. Indeed, while no "clear statement" is required, the law provides a presumption against changes or exceptions to common law. *United States v. Texas*, 507 U.S. 529, 534 (1993) ("statutes which invade the common law are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident" (cleaned up)).

Here, the ambiguous nature of TRIA's "notwithstanding" clause fails to overcome this presumption. While undoubtedly the purpose of TRIA was to afford victim-creditors additional assets against which to recover their terrorism-related judgments, nothing in the statute hints that Congress intended such creditors to pursue assets already subject to a court's in rem jurisdiction in other litigation. The prior exclusive jurisdiction doctrine not only prevents a victim-creditor from pursuing assets already subject to in rem jurisdiction in another case, it prevents one victim-creditor from attempting the same when the existing in rem matter was brought by another victim-creditor. Creditors do not attempt to develop a limiting principle to their theory or provide any support for their argument that Congress

intended TRIA's "notwithstanding" clause to reward the creditor that placed its case in the hands of the quickest Article III judge. Moreover, the Supreme Court has already remarked on the purpose of TRIA's "notwithstanding" clause, and it was not to displace common law doctrines but to emphasize that the waiver provisions of FSIA Section 1610(f) did not apply to its provisions. *Ministry of Def. v. Elahi*, 556 U.S. 366, 386 (2009) ("the history suggests that Congress placed the 'notwithstanding' clause in § 201(a) for totally different reasons, namely, to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment").

*Third*, the Owens Creditors argue that the doctrine is inapplicable here, not because of TRIA's "notwithstanding" clause, but because the doctrine supposedly does not apply to prevent two judges in the same courthouse from exercising in rem jurisdiction over the same piece of property. Owens Br. at 48–51. Not so. Two district judges (Judge Bates who issued the Owens Writs and Judge Boasberg who is presiding over the Forfeiture Action) are no more bound by each other's rulings than this Court and the judges presiding over the Levin Creditors' actions in South Dakota and New York. As such, the core animating feature of the ancient rule is on full display here—without it, the same res could be subject to competing rulings in multiple different proceedings.

The Owens Creditors further complain that such a rule would turn merely on the case assignment practices of the Court, creating an artificial barrier to pursuing a writ against property subject to the Court's in rem jurisdiction in another proceeding. Again, not so. The rule prevents two suits, regardless of their venue or assignment, to exercise in rem or quasi in rem jurisdiction over the same property. The first filed *suit* takes precedence under the well-established doctrine. *See, e.g., United States v. Bank of N.Y. & Tr. Co.*, 296 U.S. 463, 477 (1936) ("If the two *suits* are in rem or quasi in rem . . . the jurisdiction of one court must of necessity yield to that of the other.") (emphasis added); *Hammer v. Dep't of Health & Hum. Servs.*, 905 F.3d 517, 536 (7th Cir. 2018) ("two *suits*, both of which are in rem or quasi in rem and require the courts to have possession or control of the same property, cannot proceed at the same time, and the second court must yield to the first") (emphasis added).

Contrary to Creditors' assertions, applying this rule here is fair and just. The Forfeiture Action first obtained in rem jurisdiction over the Funds and, thus, the rights and obligations of interested parties as they existed when that case began should be decided there.[5]

---

[5] The arguments advanced by Amicus Crystal Holdings are largely irrelevant to this Appeal and its interests in the Funds (and any Iranian interests outside the TRIA context) are conclusively refuted by UCC Article 4A, which governs commercial parties' interests in blocked funds transfers. Nonetheless, Crystal Holdings is correct that the issue of who should ultimately take title to the Funds is

- 45 -

## II.  FSIA PROVIDES NO BASIS FOR THE WRITS.

FSIA provides no basis to sustain the Writs.  Like TRIA, the prior exclusive jurisdiction doctrine equally bars attachment under FSIA as the Forfeiture Action first acquired in rem jurisdiction over the Funds.  Further, unlike TRIA, attachment under FSIA faces other obstacles.

### A.  The Civil Forfeiture Statute Bars Creditor Process Against Property Arrested Under Forfeiture.

Section 981 provides mechanisms for bringing property into the in rem jurisdiction of a civil forfeiture action.  Those mechanisms include (1) seizure warrants "obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure[;]" (2) arrest warrants issued by a court "pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims" after the government files a forfeiture complaint; and (3) seizures incident to a lawful arrest or search.  18 U.S.C. § 981(b).  Once property has been brought into the in rem jurisdiction of a civil forfeiture proceeding the statute goes on to command that it is not "repleviable," is "deemed to be in the custody of the Attorney General," and is "subject only to the orders and decrees of the court or the official having jurisdiction thereof."  18 U.S.C. § 981(c).  In other words, once a piece of property

---

not before the Court.  That issue must be addressed in the Forfeiture Action where the United States claims it has a preexisting forfeiture interest in the Funds that supersedes all others.  18 U.S.C. § 981(f).

is subjected to the in rem jurisdiction of a civil forfeiture proceeding, the forfeiture court alone can issue orders concerning it.  *Cf. PacNet Servs., Ltd. v. Dep't of Treasury*, No. 21-1069, 2022 WL 2561204, at *1 n.3 (2d Cir. July 8, 2022) (in criminal forfeiture, "ancillary proceedings are the exclusive procedure through which a third party may assert an interest in property that is subject to forfeiture in a criminal case" (citing *United States v. Daugerdas*, 892 F.3d 545, 553 (2d Cir. 2018) ("It is well settled that section 853(n) provides the exclusive means by which a third party may lay claim to forfeited assets." (cleaned up)))).

Even were TRIA exempt from this rule given its "notwithstanding" clause, FSIA Section 1610(a) has no such clause.  As such, Section 981(c) of the civil forfeiture statute applies with full force to bar Creditors' attempts to use FSIA to attach the Funds in these separate writ proceedings.[6]

In response to this straightforward application of the civil forfeiture statute, Creditors attempt to collaterally attack the Court's jurisdiction in the Forfeiture Action, claiming that the United States did not properly execute its arrest warrant on the Funds or take possession of them.  Owens Br. at 59-60.  But Creditors cannot

---

[6]    Because the FSIA provision on which the Owens Creditors rely lacks a "notwithstanding" clause, were this Court to sustain the Writs solely under FSIA, the District Court on remand or in the Forfeiture Action may also have to decide whether Creditors may pursue those Writs absent an OFAC license.  *Harrison v. Republic of Sudan*, 802 F.3d 399, 406–09 (2d Cir. 2015), *clarifying op. & denying reh'g*, 828 F.3d 86, 96–97 (2016).

through these writ proceedings seek to challenge the District Court's exercise in a wholly separate civil action. If Creditors wish to challenge the arrest warrant's execution in the Forfeiture Action, they can try to do so in that case if they have standing. *United States v. Vazquez-Alvarez*, 760 F.3d 193, 197 (2d Cir. 2014) (before a party can challenge execution of warrant in forfeiture proceeding, it must establish standing in forfeiture action itself). But they cannot be heard in these proceedings to challenge the District Court's jurisdiction in a wholly separate civil action. *See Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376 (1940) (District courts are "with authority, when parties are brought before them in accordance with the requirements of due process, to determine whether or not they have jurisdiction to entertain the cause and for this purpose to construe and apply the statute under which they are asked to act. Their determinations of such questions, while open to direct review, may not be assailed collaterally.").

Creditors' only other argument for evading the barring effects of the civil forfeiture statute is that they filed their writ proceeding in the district where the Forfeiture Action was pending. Owens Br. at 58–59. But the clear language and congressional intent of Section 981(c) does not permit multiple civil proceedings in the same courthouse to exercise in rem jurisdiction over a single piece of property. Creditors cite no case suggesting as much. Indeed, authorities suggest the contrary.

*See United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1235 (9th Cir. 1988) (affirming dismissal of proceeding filed in same district as civil forfeiture action).

For example, in *Cason v. Holder*, 815 F. Supp. 2d 918, 926 (D. Md. 2011), *aff'd*, 464 F. App'x 131 (4th Cir. 2012), the court dismissed a civil suit seeking an injunction compelling the Government to return certain a vehicle that was subject to a forfeiture action. The court did so despite the civil suit being filed in the same district as the forfeiture case, reasoning, "[t]he federal district court is, of course, competent to hear the civil forfeiture case assigned to [another judge] . . . But, any matters concerning the vehicle must be addressed in that case. Civil forfeiture proceedings are in rem. Permitting competing actions to each lay claim to the right to adjudicate title to the res opens the door to inconsistent results and clouded title." *Id.* Based on the same reasoning, courts (including this one) have dismissed proceedings for return of property under criminal rules when civil or administrative forfeiture proceedings are pending against the same property. *See United States v. Price*, 914 F.2d 1507, 1511 (D.C. Cir. 1990) (finding claimant could pursue a separate return-of-property suit under Criminal Rule 41(e)); *Ibarra v. United States*, 120 F.3d 472, 476 (4th Cir. 1997) (dismissing plaintiff's claim to recover seized property because the court lacked subject matter jurisdiction once the forfeiture proceeding commenced); *United States v. Hernandez*, 911 F.2d 981, 983 (5th Cir. 1990) (claimant's "arguments, amounting to a claim that he was deprived of his

property without due process of law, are not properly before us, as the proper place to litigate the legality of the seizure is in the forfeiture proceeding"). In short, Creditors cannot seek orders concerning the Funds under FSIA when the Forfeiture Action remains pending and exercises in rem jurisdiction over the Funds.

Moreover, even were the execution of the arrest warrant in the Forfeiture Action properly before this Court, there can be no serious dispute that the Funds were properly brought into the in rem jurisdiction of that action before Creditors obtained their Writs. By memorandum entitled "Block Pending Investigation" issued to Wells Fargo by OFAC dated March 12, 2020, OFAC directed Wells Fargo to block and not otherwise transfer the Funds "unless otherwise authorized by OFAC." Blocking Memos. (Memo. of Mar. 12, 2020), JA269–71. Thereafter, the United States filed the Forfeiture Action on May 1, 2020. JA273–85. That same date the Court issued to the United States a warrant for arrest in rem. Forfeiture Action, ECF No. 3. Because the Funds were in the exclusive control of the United States pursuant to OFAC's blocking memorandum, *see Zarmach Oil Servs., Inc. v. Dep't of Treasury*, 750 F. Supp. 2d 150, 157 (D.D.C. 2010) ("Once blocked, the assets cannot be transferred except pursuant to an OFAC license."), issuing the warrant to the United States arrested the Funds, bringing them within the in rem jurisdiction of the Forfeiture Action. Fed. R. Civ. P. Supp. R. G(3)(b)(i), G(3)(c)(ii)(A); *see also Vazquez-Alvarez*, 760 F.3d at 197 ("execution of the arrest

- 50 -

warrant is specifically excused by the Forfeiture Rules when the property is already in the government's possessions, custody or control"); *Propper v. Clark*, 337 U.S. 472, 488 (1949) (to assert jurisdiction "for an in rem action it is sufficient" that "there be some form of service which is reasonably calculated to give notice to parties whose interests may be affected").

Accordingly, because the Funds were subject to the in rem jurisdiction Forfeiture Action at the time Creditors sought their Writs, the civil forfeiture statute forbids any other court in any other action from issuing orders concerning the Funds. This prevents Creditors from relying on FSIA to attach them.

### B.    The Funds Were Not Being Used for a Commercial Purpose When Creditors Attached Them.

Even were the Court to get past the civil forfeiture statute, which it should not, attachment and execution under FSIA would still be improper. To attach property of a foreign state under FSIA Section 1610(a), the property must (among other requirements) be "used for a commercial activity in the United States." 28 U.S.C. § 1610(a). In *TIG Insurance Co. v. Republic of Argentina*, 967 F.3d 778, 780 (D.C. Cir. 2020), this Court considered whether a judgment creditor of the Republic of Argentina could attach certain Argentine property located in the United States under FSIA Section 1610(a). *Id.* The parties agreed that the property was owned by Argentina, that it was located in the United States, and that one of the seven specific exceptions applied, leaving solely in dispute the requirement "that the property be

'used for a commercial activity in the United States[.]'" *Id.* at 781. After a lengthy discussion of the law and the parties' contentions, the Court reached two general conclusions regarding the requirement.

First, the Court held that whether a piece of property was "used for commercial activity in the United States" should be examined at the time the judgment creditor files papers to attach it. *Id.* at 782-83. Second, the Court held that "courts should look to the totality of the circumstances to make this determination." *Id.* at 785. Specifically, courts must examine the recent-past, present, and future uses of the property at issue. *Id.* at 785-88.

Applying these standards, the Funds clearly were not "used for a commercial activity in the United States" when Creditors sought to attach them. When Creditors filed to attach the Funds on May 22, 2020, they were not, and had not been for months, used for any activity, let alone a commercial one. Also, any commercial activity intended for the Funds in the United States months prior was thwarted at the threshold because OFAC blocked the Funds immediately when they came to Wells Fargo. The Funds had been "blocked" since October 23, 2019, frozen at Well Fargo. Moreover, although the Funds are not now "frozen," the sole current permitted use of the funds is not a commercial act—namely, the United States' forfeiture of the Funds. Accordingly, measured at the time Creditors filed to attach them, the recent

past, present, and future uses of the Funds do not include any commercial activities, and FSIA Section 1610(a), thus, provides no basis to attach them.

The Owens Creditors lone retort is a request for the Court to give dispositive weight to the past uses of the Funds months prior.  That is, the Owens Creditors ask this Court to cast aside the reasoning of *TIG Insurance* and its answer to the primary question it posed, "at what moment in time should a district court assess whether a property is one 'used for a commercial activity'?"  967 F.3d at 782.  Contrary to the Owens Creditors, the Court's answer to the question—the "time-of-filing approach best accords with the text and purpose of the FSIA[,]" *id.*—expressly does limit "the temporal scope of [the] assessment."  Owens Br. at 56.  It expressly directs the assessment must be undertaken based on the circumstances when the writs were issued and expressly directed courts to "avoid finding . . . uses in the distant past, sufficient to satisfy the 'used for a commercial activity' requirement."  *TIG Ins.*, 967 F.3d at 788.  In the totality of the circumstances present when Creditors obtained their Writs, the Funds were not being "used for a commercial activity" in the United States when Creditors attached them.

- 53 -

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should affirm the judgment in this matter.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:     */s/ Brian P. Hudak*
        BRIAN P. HUDAK
        Chief, Civil Division
        601 D Street, NW
        Washington, DC 20530
        (202) 252-2549

*Attorneys for the United States of America*

Dated: February 12, 2024

## CERTIFICATE OF COMPLIANCE
(Fed. R. App. P. 32(a)(7)(B))

The text for this Brief for Appellee is prepared using Times New Roman, 14 point and—including the Statement of Issues but omitting those items described in Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1)—contains 12,997 words as counted by Microsoft Word 365.

*/s/ Brian P. Hudak*
BRIAN P. HUDAK
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of February 2024, I caused a true and correct copy of the above Brief for Appellee to be served upon all counsel of record by filing the brief on the Court's ECF system.

*/s/ Brian P. Hudak*
BRIAN P. HUDAK
Assistant United States Attorney